STATE *v.* SAM HOWARD.

November Term, 1935.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and
SHERBURNE, JJ.

Opinion filed February 16, 1936.

138

*Harry B. Amey* and *David E. Porter* for the respondent.

*Lee E. Emerson*, State's attorney, for the State.

THOMPSON, J. The respondent was tried by jury in Orleans County Court, March Term, 1935, on an information of the State's attorney, charging that he did wilfully and maliciously set fire to and burn a building in Newport City owned and controlled by him, and known as the Sam Howard Block, together with his household furniture and stock of merchandise therein,

with intent to defraud five fire insurance companies having the fire insurance thereon. The jury returned a verdict of guilty. Judgment was rendered on the verdict, and sentence imposed. The case is here for review on respondent's exceptions, on his petition to dismiss the case, and on his petition for a new trial.

The State raises the question that the respondent has not adequately briefed the case, and therefore his exceptions are not before this Court. There may be some ground for this criticism of the respondent's brief, but the brief of the State is not entirely free from the same criticism. We think that, on the whole, both parties have sufficiently briefed the case so that we can pass upon all questions that have been properly raised.

We consider first the petition of the respondent to dismiss.

The substance of the ground of the petition is that the respondent is immune from further prosecution in this case, because, in obedience to a subpoena issued by the deputy fire marshal, he appeared and testified under oath at an investigation held by the deputy fire marshal at Newport City on January 7, 1935, as to the nature and cause of the fire that destroyed his building.

It appears from the agreed statement of facts relating to the petition, that the fire in question happened in the night of December 31, 1934; that the State's attorney assisted at the investigation of January 7, 1935; that the deputy fire marshal summoned and compelled the attendance of the respondent before him by the issuance of a subpoena, which was served on him by a deputy sheriff of Orleans County, to testify relative to the cause, origin, and circumstances of said fire, all under the provisions of chapter 317 of the Public Laws; that then and there, under such circumstances, the respondent gave testimony under oath relating to said cause, origin, and circumstances of said fire, and then and there was by said State's attorney and deputy fire marshal subjected to examination and inquiries relating to said subject matter, all as shown by a transcript of the testimony so given, which is referred to and made a part of the statement of facts; that during the jury trial the respondent was repeatedly questioned by the State's attorney regarding the testimony which he had so given before the deputy fire marshal.

Under the provisions of P. L. 8171, 8173 and 8174 of chapter 317, the fire marshal and deputy fire marshal, or either of them,

are empowered to summon and compel the attendance of witnesses before them to testify relative to any matter which is, by the provisions of the chapter, a subject of inquiry or investigation, and a person so summoned shall not be excused from attending before them; also, they are empowered to administer oaths or affirmations to any person appearing before them as a witness, and if a person so summoned before them refuses to be sworn or to testify, he may be punished as for a contempt of court.

The so-called immunity statute, on which the respondent bases his claim to immunity from further prosecution, is now found in P. L. 1705 and 1706.

P. L. 1705 provides:

> ''A person shall not be excused, on the ground that it may tend to incriminate him or subject him to a penalty or forfeiture, from attending and testifying, or producing books, papers, documents or other evidence, when subpoenaed by any court at the request of the state in any prosecution or investigation based upon or growing out of any alleged violation of any criminal law which provides for fine or imprisonment in the county jail or the house of correction.''

P. L. 1706 provides:

> ''A person shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpoena issued at the request of the state and under oath, he may so testify or produce evidence, and no testimony or evidence so given or produced shall be received against him, but a person shall not be exempt from prosecution and punishment for perjury committed in so testifying.''

The immunity statute, as first enacted, was No. 38 of the Acts of 1931. There is only one section in that act and it consists of one paragraph divided into two sentences. The act was

amended by No. 34 of the Acts of 1933. The only change wrought by the amendment was to provide that the act shall apply only to a person testifying under a subpoena issued at the request of the State. The first sentence of the act of 1931, as originally enacted, applied to a person "when subpoenaed by any court," and the second sentence applied to a person who testified under oath "in obedience to a subpoena." By the express language of the act, as originally enacted and as amended, its provisions apply to any prosecution or investigation based upon or growing out of the alleged commission of a misdemeanor. They do not apply to any prosecution or investigation based upon or growing out of the alleged commission of a felony.

■■ The only change made in the act of 1931, as amended, in the last revision of the statutes, was that the first sentence of that act became Section 1705 of the Public Laws, and the second sentence became Section 1706 of the Public Laws. The rule is that changes in a revision of statutes will not be regarded as altering the law, which is well settled by the plain language of the statute, or by judicial construction, unless it is clear that such was the intention. *Bigelow, Admr.* v. *Town of St. Johnsbury*, 92 Vt. 423, 434, 105 Atl. 34; *Clark* v. *Powell*, 62 Vt. 442, 444, 20 Atl. 597; *Cuthbertson* v. *Ritchie*, 99 Vt. 50, 54, 130 Atl 756; *Whitcomb* v. *Davenport's Estate*, 63 Vt. 656, 658, 22 Atl. 723; *State* v. *Bosworth*, 86 Vt. 71, 74, 83 Atl. 657. That there was no intention to change the Act of 1931, as amended, in the revision of the statutes, appears from the fact that the language of that act and the language of P. L. 1705 and 1706, when they are read together, is identical.

■■ It follows that the provisions of P. L. 1705 and 1706 cannot be applied to this case unless it appears that the offense of which the respondent was convicted is a misdemeanor. The penalty for that offense is imprisonment in the state prison for not more than ten years or a fine of not more than two thousand dollars. P. L. 8423. The respondent contends that, as the offense may be punished by a fine, it is a misdemeanor. This contention cannot be sustained. P. L. 8750 provides that offenses which may be punished by death or imprisonment in state prison are felonies; that all other offenses are misdemeanors. The fact that the offense may be punished by imprisonment in the state prison makes it a felony. The fact that

there is an alternative penalty of a fine does not reduce the offense to a misdemeanor. P. L. 8762, to which the respondent refers in his brief, is not applicable to this case. Since the provisions of the statute do not apply to an investigation or prosecution based upon, or growing out of, the alleged commission of a felony, the petition to dismiss is denied.

The Howard Block, so-called, which was burned, was a frame building located at the forks between Bay Street and Farrant Street in what is known as Batesville in Newport City. It consisted of two wings, each about 100 feet long and three stories high, on Bay Street and Farrant Street respectively. The two wings formed an acute triangle. The first two floors of the building were divided into apartments. The respondent is a merchant, and, at the time of the fire, three apartments on the first floor were occupied by his store. His main store was in an apartment that faced on Bay Street. The other two apartments, one of which was used as a backstore and the other as a storehouse, were on the Farrant Street side of the block. The respondent occupied two apartments on the second floor on the Farrant Street side as a home. There was a dance hall on the third floor that was entered by a stairway on the Farrant Street side, at the extreme end of the building. The dance hall floor had been extended over the stairway that went from the second floor to the dance hall, and the top and sides of the stairway had been boarded over with a door left at the bottom. The respondent had held dances in the dance hall, but they were discontinued in 1933. There were rooms on the third floor that went with apartments on the second floor. At the time of the fire, some of the apartments were occupied by tenants and others were vacant. Each apartment had a cellar in the basement of the building, with a stairway from the apartment to its cellar. The respondent had a cellar under his store on Bay Street which extended back under the backstore and storehouse on the Farrant Street side. There was a hot-air furnace in the cellar under the front store, and in the cellar back of that was block wood which he burned in the furnace, kindling wood, oil, and empty boxes.

The State tried the case on the theory that the fire started on the Farrant Street side of the building, in the cellar under the backstore or storehouse, and that it was set by the respondent.

It introduced evidence which tended to show that the fire started about 10.30 o'clock p.m., and also evidence which tended to show that it started later than that time. The respondent's defense was, in part, an alibi. His evidence tended to show that on the night of the fire he played cards with friends in Newport City from about 8 o'clock p.m. until about 10.20 or 10.30 p.m.; that he then went to Rock Island, P. Q., and attended the midnight moving pictures there with some friends; that he was in Rock Island at such a time that he could not have been in Newport City shortly before the fire started. The State's evidence tended to show that he was in Newport City, and near his store, a short time before the fire started.

■ ■ At the close of the State's evidence, and again at the close of all the evidence, the respondent moved for a directed verdict in his favor, on the ground that there was no evidence which tended to show that he set the fire. Both motions were denied, and the respondent was allowed an exception to the denial of each motion. The respondent waived his exception to the denial of the first motion by proceeding with the trial and introducing evidence, so we consider only the exception to the denial of the motion made at the close of all the evidence. We have examined all of the evidence, and are satisfied that there were questions for the jury to decide. This exception is not sustained.

The State was permitted in the trial below to introduce evidence of fires in the respondent's building and on his premises, which happened prior to the fire he is accused of setting. This evidence was introduced for the purpose of showing what the intent of the respondent was with reference to the fire in question. The State raises the question that the respondent has not saved a proper exception to the admission of most of the evidence of prior fires introduced by the State. The question of the admissibility of such evidence was raised early in the trial, during the direct examination of Joe Pond, a fireman of the city, a witness for the State, and the first witness to testify about prior fires. He testified about the so-called closet fire and stairway fire to which we will refer later. Most of his testimony was received subject to objection and exception by the respondent on the ground that there was no connection between those fires and the fire in question. During the direct examination of

■

the witness, counsel for the respondent said: "Let me have an exception to this line as it goes along and I won't keep interrupting." The court replied: "Certainly, your exception may cover it." It is doubtless true, as claimed by the State, that this general exception applied only to the testimony of the witness Pond of the two prior fires about which he was testifying, and that it did not apply to the testimony of subsequent witnesses.

Eber Humphrey is the chief of the fire department of Newport City. He was the second witness for the State to testify about prior fires on the premises of the respondent, and his testimony followed that of the witness Pond. After he had given his name and residence, and before he testified about prior fires, counsel for the respondent said: "I would like to know if I couldn't object, and have an objection at this time, to all evidence relating to the previous fires so I won't have to keep interrupting?" The court replied: "Yes, the respondent may have an exception." Thereafter, all testimony of prior fires introduced by the State was received without further objection or exception by the respondent.

The State contends that the respondent should have objected specifically to the testimony of each subsequent witness of prior fires, otherwise he waived his objection and exception. The real ground of objection to the admission of evidence of prior fires, relied upon by the respondent throughout the trial, was that there was no connection between the prior fires and the fire in question. The court recognized that that was the real ground of objection to the admission of such evidence, as it assured the respondent that it would try and protect him if the State's attorney failed to make the connection which he had assured the court he would make. When the general exception to the admission of such evidence was allowed the respondent at the beginning of the direct examination of the witness Humphrey, counsel for the respondent did not restate the ground of his objection to the admission of such evidence. The purpose of the general exception was to obviate the necessity for counsel for the respondent constantly to interrupt the examination of witnesses for the State of prior fires, for the purpose of restating the ground of his objection to the admission of such evidence. It fairly appears from the record that the

court and the parties understood that subsequent evidence of prior fires introduced by the State was received subject to the objection that there was no connection between such fires and the fire in question. In the circumstances of the case, it was not necessary for the respondent to object to the testimony of each subsequent witness of prior fires, to save his exception. The contention of the State is not sustained.

The State says in its brief that it introduced evidence of four prior fires, *viz.:* a fire on November 13, 1931, called the Lord fire; (2) a fire on December 24, 1931, called the closet fire; (3) a fire on April 8, 1932, called the stairway fire; (4) a fire six or seven months before the trial. We will consider those fires in the order named.

1. The fire of November 13, 1931, called the Lord fire.

In 1931, Leonard Lord and his wife, Marie Lord, witnesses called by the State, lived on the first floor of the respondent's block in an apartment at the extreme end of the Farrant Street side. They vacated the apartment on November 13, 1931.

Leonard Lord testified that about 4 o'clock p.m., on the day they vacated the apartment, he was over to the block to get a clothesline; that the respondent came out the back way and said: "What have you tried to do, set the block on fire before you leave?"; that he replied: "What are you talking about, we haven't been smoking, any of us, while we move"; that the respondent then said: "Well, it seems funny, Mrs. Bliss said she took two water pails to put the fire out, but I haven't been in to see if they have been a fire there." Mr. Lord also testified that the respondent told him that the fire was at the foot of the stairs in his (Lord's) cellar. Mrs. Lord testified that when they left the apartment she did not lock any doors and she kept the key to the apartment.

The respondent testified that he did not know anything about that fire; that one of the tenants reported it to him, how they put the fire out; that he went down to see the fire but he couldn't find any fire; "they told me it was a smoke and burning. I didn't see anything burning at all, they put it all out."

2. The closet fire of December 24, 1931.

That fire happened at about 1.15 o'clock a.m. in a vacant apartment on the first floor of the block at the extreme end of the Farrant Street side, at the head of a stairway that went

from that apartment to the cellar, not far from the entrance to the dance hall, and about 100 feet from the apartment in which the respondent lived. It was the apartment that was vacated by Leonard Lord and his wife on November 13, 1931. There had been a dance that night in the dance hall, which was two floors above the apartment that was on fire. The respondent was present at the dance, but he left the hall and went to his apartment before the dance was over. The fire was discovered as the people were leaving the dance hall. It was discovered by Perley McGee, a witness for the State, who had attended the dance. He testified that he saw the light upstairs, and then he went around up the stairs onto the veranda and pushed the door open and walked in, and there was smoke in there. He did not go any further, but went around up to the respondent's part and told him about the fire, and then he went over and blew the alarm; that the fire seemed to be just in a small place at the head of the stairs there.

It appears from the testimony of Eber Humphrey, the fire chief, that the smoke from that fire was rather heavy; that there was quite a strong odor of oil in the apartment; that on the floor of the closet there was waste material consisting of scraps, labels, excelsior, wrappers, cards, large cartons, "and what one would naturally call general rubbish"; that there was a strong odor of oil about the waste material; that most of the contents of the closet were burned by the fire. The respondent was present at that fire. Mr. Humphrey talked with him about the possibility of anybody getting into the apartment. The respondent told Mr. Humphrey that the door was locked and the windows were fastened. Mr. Humphrey found that the windows were fastened very securely. They had to use axes to open them to let the smoke out of the apartment. A short time after the fire, Deputy Fire Marshal Preble took a glass jar without any liquid in it from the closet. The jar had a very strong odor of oil. Mr. Humphrey found a jar with liquid in it in the corner of the cellar-way. The odor of that jar was "oil odor, gasoline and kerosene." The respondent denied any knowledge of those jars or of the rubbish in the closet.

3. The stairway fire of April 8, 1932.

That fire happened about 3 o'clock a.m. There had been a dance in the dance hall the night before. The fire was in the

extreme end of the Farrant Street side of the block in a stairway that went from the second floor to the dance hall above, and about 100 feet from the apartment in which the respondent lived. The dance hall floor had been extended over the stairway, "closed in, boarded over the top," and the door at the bottom was locked. The fire was on the stairs. There was quite a blaze when the firemen arrived. The stairs were practically destroyed and the flooring overhead was burned out, which indicated that the fire started on the stairs. The respondent arrived at the fire when it was nearly extinguished. Some of the firemen had to tear up some of the hardwood flooring near the stairway because smoke was coming up through and there were indications that the fire had spread beneath the floors. The respondent criticized the firemen for damaging the floor; he said it was not called for, was not necessary. There was nothing unusual about the smoke from that fire.

The respondent testified that there was a door on the fire escape that opened into the stairway; that on cold nights the dancers would go into the stairway and sit on the stairs and smoke cigarettes; that when he went to the fire he saw a lot of cigarette stubs around the stairs.

4. The fire of six or seven months before the trial.

The State introduced evidence of two fires, one a small fire in a vacant apartment on the Bay Street side of the block, and the other a fire in an apartment on the second floor at the extreme end of the Bay Street side, either of which may be the fire relied upon by the State. When the State's attorney was examining the witnesses about those fires, he fixed the time of each fire as "last winter," and no more definite time appears. As we are unable to determine from the brief of the State or from the record which fire the State relies upon as "the fire of six or seven months before the trial," we do not consider the circumstances of either fire, for want of proper briefing.

The State also introduced evidence of what it refers to as the "torch" fire. About a week before the fire in question, the respondent was thawing frozen water pipes in the cellar with a gas torch. Nelson Lamere, a witness for the State, who was living in the block at the time, testified that he was down cellar splitting wood for a lady; that he heard a kind of a blowing noise, and he thought someone was down there thawing out the water;

that he saw a light on the ground; that he went along and looked at it, and it was a torch left tipped over onto the ground on some chips and stuff, chips from the wood where they had split wood; that he picked the torch up and brought it out and set it up in the window; that in a little while the respondent came down and he said to him: "I found your torch or somebody's torch down here"; that the respondent said: "Yes, I left it down so it would thaw out that pipe, I hung it upon a wire and it must have fell down."

The State says in its brief: "The witness Lamere testified that the blow torch, which had been used for thawing pipes, had been deliberately thrown down into a pile of rubbish, while still going, and left there by the respondent." This is a misstatement of the testimony of the witness Lamere. There is no evidence that the respondent deliberately threw the torch into a pile of rubbish, or that it got onto the ground in any other way than as the respondent told the witness Lamere. There is no evidence that the torch started a fire in the cellar or that there was any fire there.

The State also introduced evidence of the burning of rubbish by the respondent. It appears that the respondent had a steel barrel on the ground outside of his block, in which he burned paper and other rubbish; that sometimes, when the barrel was full, he burned rubbish on the ground. Marie Lord testified that, while she and her husband, Leonard Lord, were living in an apartment in the block in 1931, on several occasions when the respondent was burning papers on the ground outside, sparks and flames would fly in the direction of their apartment; that usually she had to close the kitchen windows because the smoke would come into the kitchen; that several times a big bunch of burning paper flew into their back hall. She never complained to the respondent about the rubbish fires. On one occasion she overheard the respondent arguing with Fire Chief Humphrey, and he told Mr. Humphrey that no one could stop him from making a fire if he wanted to.

Mrs. Ella Prue, who lived near the respondent's block, testified that four or five years ago she had trouble with the respondent about his building rubbish fires just outside of his block; that he burned papers and rubbish in barrels and on the ground in his back yard; that she told him he ought not to build fires

there because the burning papers flew against their barn; that she forbade him from making a fire there because she was afraid it would set the lower part of their barn afire. She also testified that the rubbish fires were in the day time, and that the burning papers did not fly toward the respondent's block but toward her buildings.

The State says that the evidence of the so-called "torch" fire and of the rubbish fire was introduced solely for the purpose of showing gross and wilful negligence on the part of the respondent toward his property as bearing upon his desire and intent to have it burn; that the evidence of those fires, viewed in the light most favorable to the State, clearly indicated a design and intent, on the part of the respondent, wilfully to neglect and fail to safeguard his property with a view to having it burn; that "With reference to all the fires in question the respondent has not fulfilled the burden to point out to the Court specific error in the admission of evidence of all the fires. What respondent's brief says about the law about previous fires may all very well be true but he has pointed out to the Court no facts or lack of facts to which to apply it. He has not called to the Court's attention specific evidence that he was not at the previous fires, that he could not have set them, that he had no motive to set them. As far as it appears in this case it is to be presumed that the court must have found all these matters true when it denied the motion to strike out the testimony."

It will be observed from these statements that it is the position of the State that the evidence introduced by it of prior fires in the respondent's block should be considered in the light most favorable to the State, and that, when it had introduced such evidence, the burden was on the respondent to prove he did not set the prior fires. This position cannot be sustained.

■ It is the general rule that evidence of other acts or offenses is not admissible to prove the commission of the act complained of—the *corpus delicti*.

In *Commonwealth* v. *Jackson*, 132 Mass. 16, the court said:

> "The objections to the admission of evidence
> as to other transactions, whether amounting to in-
> dictable crimes or not, are very apparent. Such
> evidence compels the defendant to meet charges
> of which the indictment gives him no information,

> confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the one immediately before it, and by show- · ing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him.''

There are, however, exceptions to the general rule, and speaking generally, such evidence is admissible in a proper case as a means of identifying the respondent as the perpetrator of the crime; or to show motive, intent, or guilty knowledge on his part, when an issue, or as tending to illustrate, characterize or explain the act, when capable of more than one construction, although it may disclose other offenses. *State* v. *Winters,* 102 Vt. 36, 50, 145 Atl. 413; *State* v. *Donaluzzi,* 94 Vt. 142, 145, 109 Atl. 57, and cases cited. In the last-cited case, p. 146, this Court said:

> ''Where evidence tending to prove another offense is offered, the same considerations arise with respect to its admissibility as upon the offer of other testimony. The controlling question is: Is the evidence relevant—does it tend to prove any fact material to the issues in the case? If the evidence is admissible on other general grounds, it is no objection to its admission that it discloses other offenses, even though they are indictable. * * * The special difficulty disappears if the evidence is considered strictly upon the ground of its relevancy to the issues on trial, regardless of the fact that it may incidentally show the commission of some other offense.''

■ The State introduced evidence of prior fires in the respondent's block as tending to show the intent of the respondent in burning his block, if he in fact burned it. To make the evidence of prior fires admissible, the burden was upon the State to prove that the prior fires, of which it introduced evidence, were of incendiary origin; that the respondent set them, and that there was a connection between them and the fire in

question. There was no burden upon the respondent in that respect.

In *People* v. *Molineux,* 168 N. Y. 264, 299, 61 N. E. 286, 296, 62 L. R. A. 193, a case of murder, the court, supposing the case to be one in which evidence of a felonious intent could properly be derived from proof of the commission of other similar crimes, said :

> "The supposition necessarily implies the establishment of the extraneous crime by legal and competent evidence before it can be referred to in support of the theory that it proves the guilty intent with which the crime charged was committed."

 The connection between the other offense and the offense of which the respondent is charged must appear from the evidence. Whether any connection exists is a judicial question. If the court does not clearly perceive it, the accused should be given the benefit of the doubt and the evidence rejected. The minds of the jurors should not be poisoned and prejudiced against the respondent by receiving evidence of this description, unless the case comes clearly under the exception. Underhill's Crim. Ev. (3d ed.) Sec. 152, p. 199; *Crowell* v. *State,* 15 Ariz. 66, 136 Pac. 279. Evidence of other offenses should be substantial, and at least make out a *prima facie* case, before it is admissible. *State* v. *Bersch,* 276 Mo. 397, 207 S. W. 809; *State* v. *Jones,* 27 Wyo. 46, 191 Pac. 1075. If the evidence of another crime only amounts to a suspicion, it should not be received. *Sneed* v. *State,* 143 Ark. 178, 219 S. W. 1019. Even if the evidence establishes the commission by the accused of an independent offense, it is inadmissible unless it be shown satisfactorily that the offense had some connection with the offense under investigation. *Fountain* v. *State,* 149 Ga. 519, 527, 101 S. E. 294. The evidence of the other acts relied upon must show them to be identical with the act in question. *State* v. *Hyde,* 234 Mo. 200, 230, 136 S. W. 616, Ann. Cas. 1912D, 191. Evidence of a vague and uncertain character of another offense is never admissible. *Paris* v. *United States* (C. C. A. 8th Cir.), 260 Fed. 529.

 Viewing the evidence of the rubbish fires and the so-called "torch" fire in the light of the principles we have just

154

stated, it is clear that such evidence was inadmissible. It was received solely upon the ground that it established gross and wilful negligence and extreme carelessness on the part of the respondent toward his property as bearing upon his intent to have it burn. The rubbish fires, of which the State introduced evidence, were in 1931, and four or five years before the trial below. Even if such fires had a tendency to show that the respondent was careless and negligent in building rubbish fires, there was nothing in those fires that tended to show that the respondent set fire to his building to defraud the insurance companies. The natural and inevitable effect of such evidence upon the minds of the jurors was to prejudice them against the respondent. The evidence was not admissible for that purpose and it should have been excluded. What we have said about the rubbish fires applies to the so-called "torch" fire. Evidence of that incident was received for the same purpose that the evidence of rubbish fires was received, and it should have been excluded for the same reasons.

The State says that the evidence about the Lord fire of November 13, 1931, was ample to show respondent's connection with its setting. There is no direct evidence that the respondent set that fire, nor is there any circumstantial evidence from which that fact could be inferred. It appears from the uncontradicted evidence that that fire was extinguished by the neighbors, and that all the respondent knew about it was what the neighbors told him. The evidence introduced by the State of that fire is so vague and uncertain that it is doubtful if it can be said that there was a fire. All of the evidence about that was hearsay. The court erred in not excluding that evidence.

There is more question about the closet fire of December 24, 1931. That fire was in a closet under some stairs, in a vacant apartment formerly occupied by Leonard Lord and his wife, Marie Lord, and vacated by them on November 13, 1931. The State stresses the alleged fact that the apartment in which that fire happened was vacant; that only the respondent had access to it, and that he kept it securely locked and fastened.

It appears from the evidence that the respondent told the fire chief at that fire that the door of that apartment was locked and that the windows were securely fastened. The fire

chief examined the windows and found that they were securely fastened. It does not appear whether he examined to see if the door was locked. It appears from the evidence that the door to that apartment was not locked. Perley McGee, who discovered the fire as the people were leaving the dance hall, testified that he went up to the apartment and pushed the door open and went into the room; that it was full of smoke, and then he went to the respondent's part and then went and sounded the alarm. It also appears that Mrs. Lord had access to the vacant apartment. She testified that when she and her husband vacated the apartment on November 13, 1931, she kept the keys to it. There is no evidence that she ever returned them to the respondent. That fire appears to have been of incendiary origin, and the finger of suspicion may point to the respondent, but, in view of the fact that others had access to the vacant apartment, we think it cannot be said that the evidence makes a *prima facie* case against the respondent of setting that fire.

█ There is no evidence as to the cause of the stairway fire of April 8, 1932. The respondent testified that he kept the door at the bottom of the stairway locked, but it appears from his testimony and that of Joe Pond that there was a door on the outside that opened into the stairway. Joe Pond was one of the first of the firemen to arrive at that fire. He testified that when he arrived there that door was open. There was nothing unusual about the smoke from that fire. As far as it appears from the evidence, the probability that that fire started from cigarette stubs is as great as the probability that the respondent set it. There is no substantial evidence that the respondent set the fire, and the evidence of that fire should have been excluded.

Since the judgment must be reversed and the case remanded for a new trial, it is not necessary to consider the petition of the respondent for a new trial. That petition is dismissed without costs.

*Petition to dismiss denied. Judgment reversed and cause remanded. Petition for new trial dismissed without costs.*