# State of Vermont v. George Leslie Reed

[ 253 A.2d 227 ]

February Term, 1969

Present: Holden, C.J., Shangraw, Barney, Keyser, JJ., and Daley, C. Supr. J.

Opinion Filed April 1, 1969

*Robert E. West,* State's Attorney, for the State.

*O'Neil, Delaney & Valente* for the Respondent.

**Holden, C.J.** The respondent George Leslie Reed was tried and found guilty of the offense of grand larceny. The prosecution was by an indictment which charged him with stealing fifteen tons of flour from the Delaware and Hudson Railroad at Fair Haven, Vermont on April 22, 1967. The respondent appeals from the conviction. He claims error in the denial of his motions for a mistrial and for a directed verdict of acquittal. Error is also assigned to the trial court's instructions to the jury.

Two months before the alleged offense, on February 27, a Delaware and Hudson freight train was derailed at Fair Haven. The accident caused damage to three cars which were transporting some ninety tons of flour. Two of the cars, which were referred to in the evidence as cars 1 and 2, were extensively damaged and about half of their cargo was strewn on the ground at the site of the derailment. The third car, the Lehigh Valley, sustained only a small gash in the outer body of the car. Its inner shell was unharmed and its contents intact.

On April 20, 1967 the cars were uprighted and restored to the rails by means of cranes. They were spotted on a siding near the Fair Haven depot. An officer of the railroad testified that his employer was not particularly concerned about the exposed contents of the seriously damaged cars. However, the Lehigh Valley car was inspected and resealed to protect the load for shipment to the consignee or resale.

While at work at his tavern in Hampton, New York on Saturday morning, April 22, the respondent learned that flour was being removed from the railroad yard in Fair Haven. He testified he saw various cars and trucks going by his place of business transporting quantities of flour.

The respondent drove to the railroad yard shortly after noon in his pick-up truck with Richard Stark. The respondent testified that all three freight cars were open. A number of people were removing flour. The respondent, Richard Stark and George Taren, with the assistance of some others at the scene, loaded the truck with bags of

flour and stored it at his father's place in Hampton. He returned to Fair Haven with the same truck and procured a second load.

After this trip he borrowed his father's ten-ton van and returned to Fair Haven. He loaded this truck from the third, or Lehigh Valley freight car, and transported the contents back to Hampton.

The elder Reed testified he was a surplus food distributor for Washington County in New York State. Through his efforts some three hundred 100-pound bags of flour were sold to the Patrick Tobacco Vending Company of Glens Falls, New York. The respondent received Patrick's check for $1,585.50 in payment. From the proceeds the respondent and Stark each received about $500. They paid $300 to Reed, Senior for the use of the van, $200 to George Taren and a few dollars to one of the helpers who assisted in loading the flour.

There was no security guard or representative of the Delaware and Hudson Railroad on duty at the Fair Haven yard on April 22, 1967. The railroad did not give permission for the removal of any of the cargo from the freight cars.

Such is the sum and substance of the State's evidence. The taking of the property, to the extent alleged in the indictment, was readily admitted by the respondent during the police investigation, as well as at the trial. The defense was based on the proposition that the taking was without any felonious intent on his part and that the property was removed under the mistaken belief that it had been abandoned by the railroad.

Evidence of the participation of Richard Stark and George Taren in the alleged offense developed early in the presentation of the State's case. Later, during the course of the trial, it appeared that the prosecution had caused subpoenas to issue summoning Stark and Taren. The prospective witnesses engaged a Vermont attorney, who appeared with them at the time specified for their attendance. He informed the court and counsel in chambers that he objected to their being summoned and had advised them to claim privilege against self-incrimination.

The state's attorney then stated "for the record—that we will grant them (Stark and Taren) immunity from prosecution for any possible offense which they may possibly have committed—" concerning the respondent's activities on this particular occasion. On inquiry from the court, counsel for the respondent indicated the defense had no objection to these witnesses testifying, nor to their being offered immunity.

On the following morning, the attorney for Stark and Taren moved to quash the subpoenas, asserting possible prejudice to the State or the respondent. When the trial judge asked the respondent's counsel if he had anything to add, he replied: "No, the respondent has no comment either way with respect to the motion." The motion was denied with the statement "—(t)he court rules that if they are called they can take the Fifth Amendment at the time they feel they should."

Late in the afternoon of the same day, in the presence of the jury, the prosecutor called the witness Taren. After stating his name and occupation, he was asked if he recalled hearing of flour being taken from the railroad cars in Fair Haven at the time in question. He was interrupted by his attorney's request for a conference at the bench. This was denied, but the witness was temporarily excused from the stand to consult with his attorney before answering the question. When he resumed the stand, the witness stated he had the question in mind "—and I refuse to answer on the grounds it might incriminate me."

In the discourse which followed, out of the presence of the jury, the respondent took the position that the questions asked by the State, at least up to that point, would not tend to incriminate Taren and the privilege was not available to him. Without resolving the matter the court recessed for the day.

The next morning the attorney for the witnesses announced on the record that the witnesses would testify to all matters about their involvement in the case, on the condition that the State grant them immunity. The state's attorney responded by stating he granted both witnesses immunity from prosecution under the laws of Vermont.

At this point, the respondent presented a motion for a mistrial. The motion contended that the evidence implicated Taren in all activities of the respondent on the date of the alleged offense. The defense urged that the state's attorney's action, in calling him as a witness, when he knew he would claim his privilege, created a prejudicial atmosphere from which the jury might well infer that the respondent was guilty.

The motion was denied. The trial resumed with unrestricted examination of the witness Taren by both the prosecution and the defense. Richard Stark was later called by the State and examined at length by counsel for the prosecution and defense on the same condition.

The first concern of this appeal is whether the course of the conduct of this trial constituted prejudicial error. The area of this question has troubled courts in other jurisdictions in differing patterns of presentation.

There is no general rule to provide an easy answer to cover all situations. Error must be tested by the circumstances of each case. *Namet* v. *United States,* 393 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278, 283; *United States* v. *Maloney,* 2 Cir., 262 F.2d 535, 537.

■ The question is essentially evidentiary, arising from an impermissible inference. Evidence of guilt should not be created against a respondent because an accomplice elects to exercise a constitutional right personal to himself. *United States* v. *Maloney, supra; Billeci* v. *United States,* 87 U.S.App.D.C. 274, 184 F.2d 394, 24 A.L.R.2d 881, 895; *People* v. *Pollock,* 21 N.Y.2d 206, 287, N.Y.S.2d 49, 234 N.E.2d 223, 226; *De Gesualdo* v. *People of Colorado* (1961) 147 Colo. 426, 364 P.2d 374, 86 A.L.R.2d 1435, 1440; 8 Wigmore, Evidence §2272(b) McN.Rev.Ed.

In *United States* v. *Maloney, supra,* Judge Learned Hand probed the roots of the problem in a federal prosecution where corroboration of the unprivileged testimony of an accomplice was essential to conviction. The prosecution concealed that it anticipated two other accomplices, if called, would refuse to answer. In summation, the prosecution inferred that had a third accomplice answered, his response would have been favorable to the government. The conviction was reversed for want of adequate cautionary instructions by the trial judge. The court recognized, however, that the barirer should be removed to meet any advantage sought by the accused from the prosecution's failure to call an accomplice.

The reasoning of the majority opinion is clear.—

"When a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused. If the prosecution knows when it puts the question that he will claim the privilege, it is charged with the probable effect of his refusal upon the jury's mind * * * such refusals have been held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive." *United States* v. *Maloney, supra,* 262 F.2d *at* 537.

Another consideration permeates the issue. The persuasive effect which may stem from the refusal of an accomplice to testify is not subject to cross-examination. See *Namet* v. *United States, supra,* 393 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d at 284.

Neither of these factors is present in the case at bar. Both Stark and Taren testified. When initial silence was broken, the jury was no longer tempted to speculate or tacitly infer the respondent's guilt from their claim of privilege. Their abandonment of the privilege removed the danger of suspicious inference.

Moreover, both witnesses testified favorably to the respondent on the crucial issue of his criminal intent. On cross-examination Taren was asked:

"Q. Now, having in mind that when you heard about George Reed's unfortunate plight, that he had been charged with stealing this flour, will you now tell the Honorable Court and jury what was in your mind at the time that you were taking the flour and helping to load George Reed's truck, did you think you were stealing that flour?

A. No sir.

Q. And if you had thought that you were stealing it would you have taken it?

A. No sir."

Stark was asked on cross-examination by counsel for the respondent:

"Q. Why didn't you ask any railroad official to the take the flour?

A. Everybody was just grabbing flour and taking it, the story was that the railroad didn't want it, I took the rumor like everybody else, I thought it was right at the time."

■ If there was initial error in permitting the State to call the witness Taren to elicit his claim of privilege in the presence of the jury, it was cured when the witness testified on direct and cross-examination. No reversible error was committed in the court's refusal to order a mistrial.

The respondent contends the State failed to establish a felonious intent on his part, thus it was error to deny his motion for a directed verdict of acquittal. The respondent, with justifiable reason, refers to evidence of the rumor that flour was being given away at the railroad

site, the open and notorious manner in which the taking was accomplished, the railroad's apparent acquiescence in the removal of two or three bags of flour by numerous people from two of the freight cars and the fact that all cars were open, with cargo exposed, when the respondent arrived. There was no evidence that the respondent broke the seal on the Lehigh Valley car. Then too, the respondent was entirely cooperative and truthful in acknowledging the fact that he had carried away three truckloads of flour, specifying the quantities and cars from which it was removed, and of his efforts to sell the commodity.

██ In the language of the statute, a person is guilty of grand larceny "* * * who steals from the actual or constructive possession of another * * * money, goods, (or) chattels * * * if the money or other property stolen exceeds $100.00 in value." 13 V.S.A. §2501. A person steals if he takes property from one in lawful possession without right, with the intention to keep it wrongfully. *Morissette* v. *United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, 305. The taking of another's property in good faith, by inadvertence or mistake, may be wrongful; it may amount to a conversion or .trespass, but it does not constitute larceny. *State* v. *Levy,* 113 Vt. 459, 461, 35 A.2d 853.

██ When the taking is admitted, as it was here, innocence or guilt can only be found in the state of trespasser's mind. And even though the property be taken openly, without stealth, the question of criminal intent is for the jury to consider according to all circumstances brought before them. *Morissette* v. *United States, supra,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. at 306. *State* v. *Gilbert and Belaire,* 68 Vt. 188, 190, 34 A. 697; *State* v. *Carr,* 13 Vt. 571, 573; *Putinski* v. *State,* 223 Md. 1, 161 A.2d 117, 82 A.L.R.2d 859, 893; Am.Jur., Larceny §150.

To be sure, the evidence in some criminal prosecutions rises no higher in substance than mere suspicion, leaving the jury no alternative but conjecture on the solemn question of the respondent's guilt, as in *State* v. *Levy, supra,* 113 Vt. at 463, 35 A.2d 853. Although unguarded, the property taken from the Lehigh Valley freight car was not in disarray. Its contents were intact and merchantable. Despite the pilfering of others, the respondent's failure to obtain permission was a factor for the jury to consider. The evidence leaves little room for doubt that the respondent entertained the intention to permanent-

ly deprive the railroad of its possession of the property. Efforts to sell the property were undertaken directly. The respondent stated "When I went back on my meat route Monday, I attempted to sell the flour at one or two places since the flour was not damaged and seemed to be in good shape." It also appears that the sale proposed to Mr. Patrick by the elder Reed on the same day was subject to the approval of the respondent and those who helped him in the taking. The strength of this evidence, including the price obtained for the converted goods, is sufficient to lead the jury to disbelieve the respondent's testimony of innocent intent and conclude that his understanding the property had been abandoned, came as an afterthought.

■ There was no error in denying the respondent's motion for a directed verdict of acquittal. There remains the question—did the jury convict on proper instructions?

In dealing with the subject of witness immunity, the court instructed the jury:

"There has been some evidence in this case that the State has offered immunity to witnesses that have testified. The State has a right to do this and no inference should be drawn therefrom. You should give to those witnesses the weight that you think their testimony is entitled to receive."

■■ The respondent's exceptions at the conclusion of the charge were confined to the court's statement that the State had a right to grant immunity to a witness. Counsel appropriately called the court's attention to absence of statutory authority to this effect in felony prosecutions. *State* v. *Howard*, 108 Vt. 137, 143, 183 A. 497. But as an officer of the government, a state's attorney is afforded considerable discretion in the function of his office. *In re Petition of Keefe*, 115 Vt. 289, 291, 57 A.2d 657; *Gould* v. *Parker*, 114 Vt. 186, 190, 42 A.2d 416, 159 A.L.R. 622. And if a prosecutor, in the furtherance of justice, makes an agreement to withhold prosecution, the courts may, upon proper showing, even in the absence of statute authority, honor the undertaking. *State* v. *Emery & Pedneau*, 68 Vt. 109, 112, 34 A. 432. See also, *In re Garceau*, 125 Vt. 185, 187, 212 A.2d 633.

■ However this may be, the State's authority to offer immunity to a witness, and the witness' election to accept or reject it, does not trench upon the rights of the respondent. The privilege is personal to the witness. *State* v. *Crepeault*, 126 Vt. 338, 341, 229 A.2d 245.

540

The respondent's exception to the instruction did not touch upon what effect the State's assurance of immunity might have upon the credibility of the protected witnesses. Although this point involves a claim of error not presented to the lower court, we have examined the record to determine whether the respondent has been adversely affected by this aspect of the charge.

When an accomplice is induced, by hope of favor, to testify against his partner in an offense, his credibility may be adversely affected. And it is customary and proper for the court to caution the jury to this effect. *State* v. *Crepeault, supra,* 126 Vt. at 340, 229 A.2d 245. And had the witnesses Stark and Taren testified adversely against the respondent, the instruction that no inference should be drawn from the grant of immunity would have been in error.

The fact that the witnesses were testifying in expectation of immunity was clearly brought to the attention of the jury. And on cross-examination the respondent's counsel developed the fact that, beyond immunity, the attorney for these witnesses permitted them to testify because he was "of the opinion no crime had been committed." The witnesses' testimony was consistent with that of the respondent, including profession that their intentions were entirely innocent.

The total instructions correctly stated the true rule of law concerning the offense on trial and the crucial issues which the jury was given in charge. The verdict is not faulted on the court's isolated reference to the witnesses' immunity. The comment was not misleading. And in view of their testimony, it was not in the respondent's interest to have the jury cautioned as to their credibility. The court's failure to do so did not work to the respondent's harm. *State* v. *Coburn,* 122 Vt. 102, 110, 165 A.2d 349.

The record demonstrates that two of the errors claimed, which otherwise might have been important, were rendered harmless in the full context of the trial. They are found wanting in any influence on the decisive issue of felonious intent. There is substantial evidence to persuade the jury that the misappropriation of the carrier's cargo was done with a criminal purpose. Although the sentence was suspended, the conviction must stand.

*Judgment affirmed.*

**Smith, J.,** took no part in this appeal.