## State of Vermont v. Jane L. Wheel

[587 A.2d 933]

No. 88-385

Present: Dooley, J., and Barney, C.J. (Ret.), Meaker, Supr. J., and Mahady and Pineles, D.JJ., Specially Assigned

Opinion Filed November 30, 1990

Motion for Reargument Denied January 11, 1991

*Jeffrey L. Amestoy,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Richard E. Davis* and *T. Christopher Greene* of *Richard E. Davis Associates, Inc.,* Barre, for Defendant-Appellant.

**Dooley, J.** Defendant Jane Wheel, a former assistant judge in Chittenden Superior Court, appeals a jury conviction on three counts of false swearing, in violation of 13 V.S.A. § 2904.[1] We affirm.

Defendant was a Chittenden County assistant judge from 1975 to 1987. On November 14, 1985, the attorney general began an investigation into whether defendant had improperly submitted false pay vouchers for days on which she did not work. Acting on information that defendant had not sat on a single case from March 5, 1985 to April 12, 1985, state investigator Randall Moran reviewed case files at Chittenden Superior Court for all cases heard during that period. Moran concluded from his review that defendant had neither participated in any hearings nor signed any orders in that period. During his review, Moran uncovered several case files where it appeared that defendant's name had been added in her handwriting to the docket entries on the file jacket. These entries were for proceedings outside the target period. As a result of this discovery

---

[1] 13 V.S.A. § 2904 provides that "[a] person of whom an oath is required by law, who wilfully swears falsely in regard to any matter or thing respecting which such oath is required, shall be guilty of perjury and punished as provided in section 2901 of this title."

and upon further investigation, the State concluded that defendant may have altered the case files in order to make it appear that she had attended court proceedings when in fact she had not.

Three inquests, one in January of 1986 and the other two in May of 1986, were held to assist the investigation of the alleged misconduct of defendant and the other Chittenden County assistant judge. Defendant testified at the inquests held on May 6 and May 13. As a result of statements she made at the May 6 inquest, she was charged with several counts of false swearing. Prior to trial, the court denied defendant's motions to suppress the statements and dismiss the case. Following the trial, held from January 28 to February 23, 1988, the jury found defendant guilty of three counts of false swearing.

On appeal, defendant seeks acquittal or a new trial because: (1) the Vermont inquest procedure is unconstitutional; (2) her constitutional rights were violated during the inquest proceedings; (3) the attorney general had no authority to conduct an inquest; (4) the jury panel expressed prejudice; (5) individual jurors expressed prejudice; (6) the court allowed the State to present evidence of defendant's prior bad acts; (7) the court admitted impeached testimony and hearsay; (8) the State's concession that defendant was surprised by the questions posed at the inquest negated the specific intent element of the perjury charge; (9) the prosecution was guilty of prejudicial misconduct; (10) the court failed to charge the two-witness rule; (11) the evidence does not support the verdict; and (12) the cumulative effect of errors mandates reversal.

I.

Defendant first argues that the charges against her should have been dismissed because the Vermont inquest procedure violates the separation of powers doctrine, Vt. Const. ch. II, § 5, as well as her right to the presence of legal counsel. U.S. Const. amend. V and XIV; Vt. Const. ch. I, art. 10. Defendant made the same arguments to this Court in a motion to bring an interlocutory appeal under V.R.A.P. 5(b). We denied the motion, stating that "even if there was error in the conduct of the inquest, that error will not offer a defense to the false swearing charge or a victory through the suppression motion." *State v. Wheel*, 148 Vt. 439, 441, 535 A.2d 328, 330 (1987).

■ On several occasions, the United States Supreme Court has stated the principle that

> a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional.

*Dennis v. United States*, 384 U.S. 855, 867 (1966); see also *United States v. Wong*, 431 U.S. 174, 178–80 (1977) (defendant not entitled to suppression of false grand jury testimony even assuming a violation of Fifth Amendment's testimonial privilege and due process requirements; perjury is not a permissible way to object to government questions); *Bryson v. United States*, 396 U.S. 64, 71 n.10, 72 (1969) (subsequent determination that statute is unconstitutional is legally irrelevant to validity of petitioner's perjury conviction for statement made pursuant to that statute); cf. *United States v. Mandujano*, 425 U.S. 564, 579–80 (1976) (failure to give *Miranda* warnings to grand jury witness is no basis for suppression of false statements). Other courts, including this Court, have reiterated this principle. See, e.g., *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir.) (suppression of perjurious testimony based on constitutional principles is disallowed), *cert. denied*, 474 U.S. 944 (1985); *United States v. Caron*, 551 F. Supp. 662, 666 (E.D. Vir. 1982) (fact that grand jury was constituted in violation of federal statute did not vitiate oath or void defendant's testimony as a basis for perjury charge), *aff'd*, 722 F.2d 739 (4th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984); *State v. Wheel*, 148 Vt. at 441, 535 A.2d at 329–30 (citing *Wong*, *Weiss*, and *Bryson*); *State v. Ploof*, 133 Vt. 304, 304–05, 336 A.2d 181, 181 (1975) (despite violation of inquest's secrecy provision, suppression of perjurious statement is not appropriate where the defendant seeks to suppress verbal act of perjury rather than substance of statement).

■ In *Wheel*, we stated that defendant had made no showing that would take the case outside the scope of the United States Supreme Court decision in *United States v. Wong* and our own precedent of *State v. Ploof*. Except for her perjury trap argument, which we address later, defendant has yet to make

any such showing. According to a trial court finding, which is supported by the record, defendant appeared at the May 6 inquest despite her claim that the subpoena ordering her to attend the inquest was defective. The trial court found that "[s]he made the defect known to those in attendance at the inquest, and stated that her appearance was voluntary." Defendant may not voluntarily swear to respond truthfully to questioning and then later, as a defense against a charge that the answers were intentionally false, cite the unconstitutionality of the proceedings at which they were provided.

For the same reason, we reject defendant's argument that the attorney general does not have the authority to apply for or conduct an inquest. In any case, we note that the inquest statutes, 13 V.S.A. §§ 5131–5137, give the state's attorney the authority to apply for an inquest, and "[t]he attorney general shall also have the same authority throughout the state as a state's attorney." 3 V.S.A. § 152.

The remainder of defendant's claims concerning the inquest proceedings amount to an allegation that the sole purpose of the May 6 inquest was an attempt to entrap defendant into making perjurious statements.[2] In support of this allegation, defendant points out that (1) the definition of "official duties"[3] promulgated by the Vermont Supreme Court during the investigation effectively eviscerated the investigation and foreclosed any possibility of charging her with misconduct; (2) the State ac-

---

[2] Defendant has raised this issue in this appeal and in No. 90-326 where she contests the refusal of the court to allow a post-trial deposition of William Donahue, special counsel to the Judicial Conduct Board. Although we could defer the whole question to the later appeal, we conclude that would be inappropriate because the standard of review may be different in the second appeal, the second appeal may not reach this question, and defendant has squarely raised the issue in this appeal.

[3] 32 V.S.A. § 1141(b) provides that "[a]ssistant judges of the superior court shall receive pay for such days as they attend court when it is in actual session, or during a court recess when engaged in the special performance of official duties." In February of 1986, during the investigation of the Chittenden County assistant judges, the Vermont Supreme Court issued a broad definition of "official duties." Defendant claims that the new definition totally blocked the attorney general from charging that defendant submitted pay vouchers for days on which she had done insufficient work to receive pay under § 1141(b). The attorney general denies this claim, admitting only that his case became more difficult as a result of the definition. See *infra* note 5.

knowledged that it had no case against her after promulgation of the definition but went ahead with the second inquest anyway; (3) the State did not require the other Chittenden County assistant judge, who was also under suspicion, to testify at the inquest; (4) she was unaware that the inquest would include questioning regarding a suspected coverup, and the prosecutor's tactics during the questioning were intentionally confusing and misleading; and (5) the prosecutor improperly failed to give her the opportunity to explain contrary evidence in his possession and terminated his line of questioning once he had obtained her alleged false testimony.

■ In the context of grand jury proceedings, courts have permitted a "perjury trap" defense: "[W]here a prosecutor exhibits no palpable interest in eliciting facts material to a substantive investigation of crime or official misconduct and substantially tailors his questioning to extract a false answer, a valid perjury prosecution should not lie." *People v. Tyler*, 46 N.Y.2d 251, 260, 385 N.E.2d 1224, 1228, 413 N.Y.S.2d 295, 299 (1978). This perjury trap theory is founded on the due process prohibition against outrageous government conduct. *Nixon v. United States*, 703 F. Supp. 538, 564 (S.D. Miss. 1988), *aff'd on other grounds*, 881 F.2d 1305 (5th Cir. 1989). In order to prevail on this theory, the defendant must establish that his or her testimony did not further the investigatory role of the proceeding, and that the prosecutor asked questions designed solely to entrap the defendant. *Id.*

In *Tyler*, the court concluded that the grand jury investigation was a perjury trap because the prosecutor directed his questioning toward "minor outward details of a single meeting" with no attempt to uncover the substance of the meeting or to show the pertinence of the meeting to the investigation. 46 N.Y.2d at 260–61, 385 N.E.2d at 1229, 413 N.Y.S.2d at 300. Further, the prosecutor had acquired outward details of the meeting from a surveillance team, but failed to confront the defendant with those details or to attempt to stimulate the defendant's memory. *Id.* The court emphasized, however, that the duty of a prosecutor to stimulate a defendant's memory extends only so far as it is necessary for the prosecutor to meet the State's burden of showing that the defendant deliberately lied. *Id.* at 262, 385 N.E.2d at 1230, 413 N.Y.S.2d at 300–01; see also

*People v. Davis*, 53 N.Y.2d 164, 175, 423 N.E.2d 341, 347, 440 N.Y.S.2d 864, 870 (1981) ("The purpose of confronting a witness with contrary facts or of providing even limited cues is simply to assure that the witness' response is a deliberate falsification. Such assurance may be unnecessary, however, where there are other indicia that the response is knowingly false.").

■■ A perjury indictment requires nothing more than a demonstration of intentional falsity in response to "'purposeful substantive inquiry.'" See *People v. Davis*, 53 N.Y.2d at 173, 423 N.E.2d at 346, 440 N.Y.S.2d at 869 (quoting *Tyler*, 46 N.Y.2d at 263, 385 N.E.2d at 1230, 413 N.Y.S.2d at 301). The scope of the investigation from which the perjury charge resulted may include any questioning that could lead to a more fruitful investigation of the suspected criminal activity. *United States v. Devitt*, 499 F.2d 135, 140 (7th Cir. 1974). "When the questions relate to a proper subject of the investigation and ample cues are given, any trap that exists is not aimed at perjury, but is aimed at flushing out the truth." *People v. Panico*, 111 A.D.2d 358, 359, 489 N.Y.S.2d 122, 124 (1985). As in a grand jury investigation, the prosecutor at an inquest is not obliged to furnish witnesses with a program narrowly defining the crime to be investigated. Cf. *LaRocca v. United States*, 337 F.2d 39, 42–43 (8th Cir. 1964) (rejecting perjury trap defense against perjury charge stemming from grand jury investigation). Nor is the prosecutor obliged to advise a witness that he is committing perjury or to inform the witness of what evidence the government has against him or her. See *United States v. Sun Myung Moon*, 532 F. Supp. 1360, 1371 (S.D.N.Y. 1982).

Apparently, the first inquest in this case involved an allegation that county funds were misused to pay for a party. The State applied for a second inquest to further investigate "the possible misconduct of Assistant Judges in Chittenden County." At the time of the request for a second inquest—April 21, 1986—the State had discovered evidence indicating that defendant was involved in a coverup of her alleged submission of false pay vouchers. Further, there is evidence that on the date of the inquest defendant was aware that she was under investi-

gation for the coverup.[4] Thus, even assuming the Supreme Court's "official duties" definition foreclosed any chance of a prosecution on the false pay voucher charge,[5] the scope of the inquest properly included any coverup activities undertaken by defendant. The State's questions that elicited the alleged perjurious responses were central to the coverup issue, which, in turn, was closely related to the false pay voucher issue. In short, defendant has failed to show that the questions were outside the scope of the inquest's investigation.

■ Defendant has also failed to show that the prosecutor's questions were designed primarily to entrap her. The questions eliciting the responses the jury found to be false followed logically from extensive earlier questioning concerning the submission of pay vouchers, defendant's understanding of her primary duties as an assistant judge, her appearance at court proceedings, and the procedure for writing on file jackets. Defendant's allegations of trickery and surprise are based on the condition of the photocopies of the file jackets shown to defendant as well as the tactics of the prosecutor in questioning her about the entries. We find no support in the record that the questioning was designed to set a perjury trap. The questions posed by the prosecutor were not ambiguous or misleading; indeed, the record does not indicate that defendant had difficulty comprehending the questions. Moreover, it was perfectly proper for the prosecutor to terminate questioning concerning the file jackets without informing defendant of all of the State's

---

[4] There was evidence that defendant learned in November of 1985 that the attorney general had requested that the court administrator's office turn over her pay vouchers. Moreover, defendant testified at trial that in January of 1986 she had been advised by her attorney not to write on the file jackets and that she followed up on this advise by telling her husband not to bring writing instruments along that same month when they went to review the files.

[5] Although defendant has presented evidence that the State considered this Court's ruling to be a difficult, if not impossible, hurdle in bringing a false pay voucher charge, this would not render pointless the State's investigation of the days on which she attended court proceedings. First, at that time there was still some question as to the legitimacy of this Court's definition, in part because of charges of misconduct against certain of the justices who drafted it. Second, involvement in court proceedings remained an alternative route to proving compliance with § 1141(b). The attorney general had no way of ensuring that defendant would not claim compliance with § 1141(b) for the days in question by reliance on the case docket entries.

contrary evidence. The prosecutor's presentation to defendant of photocopies of the jacket covers assured that her responses were knowingly given and not the result of her innocent failure to recall peripheral details. As we note in Part VII, the photocopies are readable, and defendant gave no indication that she had a problem making out the signatures on the copied jacket covers. Finally, the fact that the State allowed another assistant judge under investigation to submit a sworn statement rather than testify is not significant; that judge was not suspected of attempting to coverup the submission of false pay vouchers. Defendant has not proved her perjury trap theory.

## II.

Next, defendant argues that she is entitled to a new trial because of jury prejudice. First, she contends that the entire jury panel was compromised during jury selection because members of the panel freely discussed their opinions concerning defendant's guilt. This contention stems from the following dialogue, which occurred during voir dire when one of the potential jurors mentioned that he had heard defendant had a sister who lived in the area:

Defense Counsel: Did you and [the other potential juror who knew about defendant's sister] discuss the case at all?

Juror: No. Because I honestly wasn't sure that this was even the case because I really hadn't been given any firm—you hear so much, but I just didn't know it was the case we were coming in on today.

. . . .

Defense Counsel: Did [the other potential juror] express any opinions to you about the case?

Juror: No, not really. No. Because I really—you know, like you said, I just tried to keep an open mind because I haven't heard anything to base anything on.

. . . .

Defense Counsel: [The other potential juror] didn't say anything to you about how she felt about the case or anything like that?

Juror: No. I did hear how a lot of them felt out there, but they weren't supposed to be, as far as I'm concerned. They

weren't supposed to be discussing it. They were told not to, but people do.

Defense Counsel: What do you mean by that?

Juror: A lot of jurors were discussing it. I think [the other potential juror] is—she said she was going to have a problem coming in here because of her feelings, you know, but I told her that I really hadn't followed the case.

Defense Counsel: When you say a lot were talking out there, where is out there?

Juror: In the jury rooms where they put us.

Defense Counsel: This is after the Judge had instructed them not to discuss it?

Juror: This morning. A lot of them seemed to think they knew for sure what we were coming in for from the papers. But like I said, I don't get the Rutland Herald, and I hadn't read about the case.

Defense Counsel: And those discussions, were there some opinions expressed about the case?

Juror: Well, mostly just the inconvenience that this one felt and other one felt, you know. Nothing that had anything to base it on, I don't feel.

Defense Counsel: Well, did they say things about the case, about their attitudes about the case beyond the inconvenience aspect of it?

Juror: Yeah, some did. Yeah.

Defense Counsel: Like what, for example?

Juror: Oh, that they just, you know, they had read up on it and they were basing their opinions on what they had heard in the Herald and things like that. But I was kind of, I guess kind of Greek with it because I, like I said, haven't really followed it.

Shortly thereafter, defense counsel asked the court to declare a mistrial because the panel violated the court's instructions and showed substantial prejudice "based upon what they discussed in the jury room and obviously based on what they previously read over the past year or two." The court refused to grant the motion, but segregated the panel from other jurors that had already been seated and gave the panel another cautionary instruction.

■ We first point out that while it is not absolutely clear from the record, the purported discussion among the jurors most likely occurred before the court instructed them not to discuss the case. More important, each juror was asked in follow-up interviews whether he or she had heard or read about the case and, if so, whether he or she could decide the case impartially based on the evidence presented at trial. Those who said they could not decide the case solely on the evidence were dismissed for cause; indeed, the only juror specifically mentioned in the above dialogue as having expressed bias was dismissed for cause. Notwithstanding the contradictory and vague comments quoted above, defendant has failed to demonstrate that the panel had a fixed bias against her or harbored prejudicial preconceived notions concerning the case. See *State v. Hohman*, 138 Vt. 502, 510–12, 420 A.2d 852, 857–58 (1980) (party seeking to disqualify juror must show fixed bias, not merely that juror had prior knowledge of the case; question of juror bias is within sound discretion of trial judge), *overruled on other grounds, Jones v. Shea*, 148 Vt. 307, 308, 532 A.2d 571, 572 (1987); see also *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961) (jurors need not be ignorant of facts or issues of case; it is sufficient if jurors can set aside their opinions or impressions and render a verdict based on the evidence presented in court). Accordingly, we decline to overturn the court's judgment on this point.

Defendant also contends that the court erred by not calling a mistrial because of remarks made by individual jurors during the trial. The first incident came to light when the court clerk reported that one of the jurors, frustrated by court arrangements made necessary by jury sequestration, said that he didn't care about "that woman" (presumably the defendant)—he only cared about his wife and himself. No one, not even defense counsel or the clerk who reported the incident, was sure what the juror meant by the comment, so the judge decided to interview him. The juror denied making any reference to defendant, but admitted that he had responded with irritation to what he perceived as the clerk's insensitive monitoring of personal phone calls. The court then interviewed two deputy sheriffs assigned to the jury who were present during the conversation between the juror and the court clerk. Although

one of the deputy sheriffs opined that the juror had already made up his mind about the case, neither deputy heard the juror make any reference to defendant. Moreover, upon further questioning by the court, the first deputy sheriff was unable to recall anything the juror had said or done that made the deputy believe that the juror had already made up his mind; consequently, the court concluded the deputy was only speculating that the juror had reached a conclusion on defendant's guilt. The court then interviewed the juror again and indicated that it was satisfied that he would be impartial.

The second incident arose when one of the deputy sheriffs reported that a juror said she was frustrated and she hoped she could be impartial after listening to the lengthy testimony. The court followed up on this report by interviewing the other deputy, who stated that the juror said she was going to resent the people in the courtroom with all the time being wasted. The court then interviewed the juror, who assured the judge that she had an open mind and could be fair and impartial. The court accepted this statement.

The final incident arose when one of the court reporters said that a friend of hers, who worked for the bus company that was transporting the jurors, told her that one of the bus drivers claimed that he had advised complaining jurors to find defendant guilty. After individually questioning each juror and having court personnel interview the deputy sheriffs who rode on the buses, the court found no evidence of any such action by a bus driver.

The court and both counsel agreed at one point or another that many of the comments in question were made by jurors who were irritated and frustrated after seventeen days of sequestration. The court spent the better part of a day following up on every purported comment, interviewing and reinterviewing the jurors alleged to have made the comments as well as each juror on the panel individually. After this extensive follow-up, the court concluded that nothing it had heard indicated that the jury members were biased against defendant or had prejudged the case. Upon review of the record, we conclude that the court's determination was not an abuse of its discretion. See *State v. Dragon*, 135 Vt. 168, 170, 376 A.2d 12, 13 (1977); see also *United States v. Aiello*, 771 F.2d 621, 629–30 (2d Cir. 1985) (de-

spite juror's initial concerns over her ability to be impartial, trial court's finding that juror remained able to render impartial verdict following discussion with juror entitled to deference).

Defendant points out that "[t]he expression of an opinion during the trial by a juror concerning the merits or probable outcome of a case he has been sworn to try, to anyone but a fellow juror, disqualifies him from participating in the result and will destroy the verdict." *Isabelle v. Proctor Hospital*, 129 Vt. 500, 505, 282 A.2d 837, 840 (1971). Therefore, she reasons, absent an explicit court finding that the first juror discussed above did not say what the court clerk reported, the court was required to grant her motion for a mistrial. We cannot agree.

Although the court did not explicitly find in unequivocal language that the juror did not make the statement, defendant never requested such a finding. Further, the court did point out that neither the juror nor the deputies whom the clerk herself said had been present during her conversation with the juror were able to verify the clerk's version of what the juror said. Indeed, the court noted that the juror denied making the statement and that the two deputy sheriffs did not hear what the clerk heard, despite the fact that they were present during the conversation and were able to report on some of what was said. The court then began to draw its conclusion from these facts but was interrupted by defense counsel. After a second round of interviews and further deliberation, the court concluded "that based on what I have heard, my inquiry of the jury, that there has been nothing presented that would indicate any prejudice to the Defendant." Thus, the court found that there was no support for the clerk's version of what the juror said, and that, in any case, the juror's statements did not suggest that the juror was prejudiced against defendant. The court was well within its discretion in making such a finding.

Even if we cannot construe the court's comments as a finding that the juror did not make the statement attributed to him by the clerk, we must uphold the court's conclusion that the jury members were not biased against defendant. In *Isabelle*, the party complaining of juror bias presented two affidavits stating that during the course of the trial a juror had stated that he had made up his mind that the plaintiff should not get any

money. *Id.* at 502–03, 282 A.2d at 838–39. Here, in contrast, the statement reported by the clerk is ambiguous and does not include a comment on the merits or on the probable outcome of the case. Indeed, at one point the clerk herself expressed some doubt about who the juror was referring to when he made the statement, and when asked what the comment was connected to, she said, "I think it was connected to the fact that he didn't like being here and he wanted this to be over with." As noted above, we are in an area of trial court discretion. When we consider the alleged comments in the context of juror frustration and irritation at the extended sequestration and the loss of privacy, we cannot find juror bias as a matter of law. Thus, we must conclude that the court acted within its discretion.

## III.

Defendant next argues that the court erred by allowing the prosecution to introduce evidence that she had not attended court proceedings on days for which she claimed pay. According to defendant, Vermont case law requires that evidence of an alleged prior crime must be sufficient to make out a prima facie case of the crime before the evidence can be admitted. The State, on the other hand, argues that the evidence of defendant's absence from court proceedings was necessary to show defendant's motive for covering up the absence and later denying the coverup. At a hearing on defendant's motion in limine, the trial court concluded that the evidence was relevant to the issue of defendant's motive and intent, and that its probative value outweighed any prejudicial effect. We affirm the trial court's ruling.

Under V.R.E. 404(b), evidence of other crimes or wrongful acts is not admissible to show that a person is predisposed to commit the crime for which the person is being tried; however, such evidence may be admissible to show, among other things, the person's motive or intent to commit the crime. Of course, in order to be admissible, the evidence must be relevant, V.R.E. 402, and its probative value must outweigh any danger of unfair prejudice. V.R.E. 403. In perjury or related cases where the defendant has lied or falsified documents to conceal prior conduct, evidence of the prior conduct is relevant

to show the motive behind the perjury or falsification. See, e.g., *United States v. Black*, 776 F.2d 1321, 1328 (6th Cir. 1985) (evidence of the defendant's participation in kickback scheme was central to prosecution for perjury and obstruction of justice, and was properly admitted to show motive or intent); *United States v. Birney*, 686 F.2d 102, 106–07 (2d Cir. 1982) (evidence of prior embezzlement admissible under Fed. R. Evid. 403 and 404(b) to show motive for making false entries in bank records); *United States v. Haldeman*, 559 F.2d 31, 88–91 (D.C. Cir. 1976) (evidence of prior break-in admissible to show motive for crimes of conspiracy, obstruction of justice, and perjury; probative value of evidence outweighed prejudicial effect); *Metheany v. United States*, 390 F.2d 559, 562–63 (9th Cir. 1968) (evidence relating to the defendant's handling of money in prebankruptcy proceedings admissible to prove motive for making false oaths in bankruptcy proceeding).

██ Quoting *State v. Howard*, 108 Vt. 137, 153, 183 A. 497, 504 (1936), defendant argues that evidence of a prior crime must be "substantial, and at least make out a *prima facie* case, before it is admissible." Defendant's reliance on *Howard* is unavailing because the standard employed there has been superseded by the Vermont Rules of Evidence. Vermont's Rule 404(b) is virtually identical to its federal counterpart, see Reporter's Notes, V.R.E. 404, and federal cases "are an authoritative source for the interpretation of identical provisions of the Vermont Rules." Reporter's Notes, V.R.E. 101. We adopt the recent United States Supreme Court holding that evidence of prior bad acts may be admitted for the purposes stated in Rule 404(b) without a preliminary finding by the trial court that the act actually occurred. *Huddleston v. United States*, 485 U.S. 681, 688 (1988) ("If offered for . . . a proper purpose, the evidence [of prior bad acts] is subject only to general strictures limiting admissibility such as Rules 402 and 403."). The relevance of evidence proffered pursuant to Rule 404(b) is dealt with under Rule 104(b). *Id.* at 689. When the relevance of a prior act depends on whether it actually happened, the "trial court neither weighs credibility nor makes a finding that the Government has proved [that the act took place] by a preponderance of the evidence." *Id.* at 690. Rather, the trial court de-

termines whether there is sufficient evidence for the jury to reasonably conclude that the prior act took place. *Id.*

 Here, there was abundant evidence, including court records and testimony from court personnel, for the jury to reasonably conclude that defendant absented herself from court proceedings and later attempted to cover up the absences. The trial court ruled that the challenged evidence was relevant, indeed central, to the issue of the motive behind defendant's alleged false swearing.[6] Further, after reviewing the parties' memoranda on defendant's motion in limine, the court explicitly recognized that evidence may be admitted under Rule 404(b) only if in the court's discretion the probative value of the evidence outweighed any prejudicial effect. Applying the Rule 403 balancing test, the court concluded that the evidence should be admitted.[7] We uphold the trial court's conclusion that the probative value of the evidence outweighed any potential prejudicial effect. See *State v. Angelucci*, 137 Vt. 272, 277, 405 A.2d 33, 36 (1979) ("there comes a point of relevance that cannot be overcome because of some prejudicial effect"). The court has broad discretion in weighing the competing considerations and reaching an evidentiary ruling based on that weighing process. See *State v. Parker*, 149 Vt. 393, 401–02, 545 A.2d 512, 517–18 (1988) (trial court has broad discretion in making determination under Rule 403 balancing test). It is clear that the trial court

---

[6] Defendant argues that the disputed evidence is not relevant to show motive or intent for a variety of reasons, including the following: (1) the State produced only a small number of altered file jackets; (2) the dates of some of the altered files are not within the initial investigatory period; (3) defendant was in court on the dates of the allegedly altered cases; (4) defendant believed that she could be paid for days on which she worked but did not participate in court proceedings; and (5) the State conceded at trial that altering the file jackets made no sense as a coverup. The first two of these contentions are inconsequential, the next two were disputed issues of fact on which there was ample evidence for the jury to disbelieve defendant, and the last one is not supported by the record.

[7] By this ruling, the court did not automatically allow the introduction of all evidence concerning defendant's absence from court proceedings. For example, at one point during the trial, the court refused to allow the State to present testimony by the Chittenden County scheduling clerk that defendant did not sit in court after February of 1985. Noting that the State offered the testimony to show motive through prior bad acts, the court excluded the testimony because "the prejudice [of the evidence] outweighs the probative value."

weighed the competing interests here and its conclusion was within its discretion.

## IV.

■ Next, defendant argues that the court erred by allowing the State to use impeached and hearsay testimony. Defendant first contends that the trial testimony of one of the State's witnesses, a deputy clerk, contradicted the witness's earlier deposition and, therefore, should have been excluded because it did not meet the substantial evidence test set forth in *State v. Howard*. As stated above, the *Howard* standard has been superseded by the Vermont Rules of Evidence. It was for the jury, not the court, to weigh the credibility of the witness's testimony. *Huddleston*, 485 U.S. at 690; cf. *State v. Eaton*, 134 Vt. 205, 208–09, 356 A.2d 504, 506 (1976) (it was for jury to decide whether victim's trial testimony, taken together with victim's prior inconsistent statement, was sufficient to raise reasonable doubt of the defendant's guilt). Defendant argued at trial that the witness's testimony was inconsistent with her prior statements. There was sufficient evidence for the jury to reject that argument and determine that the witness's trial testimony was truthful. Cf. *State v. Ladabouche*, 146 Vt. 279, 282–83, 502 A.2d 852, 855 (1985) (court did not err in refusing to grant a new trial due to prosecutorial misconduct where there was sufficient evidence for jury to convict defendant despite his prior inconsistent statement).

■ Defendant contends that the court erred by allowing the State's investigator to offer hearsay testimony (1) summarizing the court documents he reviewed during his investigations into whether defendant attended court proceedings, and (2) stating what he had learned from other assistant judges regarding the duties that entitle assistant judges to claim state pay. We disagree. Regarding the former testimony, even if we were to view as hearsay the investigator's testimony that none of the hundreds of file jackets he examined indicated that defendant participated in court proceedings between March and

April of 1985,[8] such testimony would be excepted from the general hearsay rule. See V.R.E. 803(10) (hearsay exception exists for evidence of the absence of a public record or an entry in a public record that would normally have been recorded had the event taken place). Prior testimony established that the requirements of V.R.E. 803(10) had been met: a record of the attendance of judges was regularly kept by a public office, and a diligent search failed to disclose the pertinent entries. See *Jackson v. United States*, 250 F.2d 897, 901 (5th Cir. 1958) (testimony by person other than custodian of records that search revealed no record of the defendant's divorce is admissible).

 The investigator's testimony concerning his interviews with other assistant judges, which was elicited on redirect following a cross-examination by defendant designed to show that the witness's investigation was incomplete and in bad faith, was perfectly proper to rehabilitate the witness. Cf. *State v. Recor*, 150 Vt. 40, 44–45, 549 A.2d 1382, 1385 (1988) (following the defendant's attempt on cross-examination to show bias of State's witness, door was open for prosecutor to consider prior bad acts). Accordingly, the trial court did not abuse its discretion by allowing the evidence for a limited purpose and then instructing the jury that the testimony was offered on redirect not for its truth, but as evidence of the investigator's understanding of the duties of assistant judges. Defendant's remaining claims regarding hearsay testimony are without merit.

## V.

 Defendant next argues that she was entitled to a judgment of acquittal because the prosecution conceded that she was surprised by certain questions at the inquest, and surprise negates the specific intent to deceive, which is a required element of false swearing. We reject this argument. The State argued at the charge conference that defendant's surprise would

---

[8] Pursuant to V.R.E. 803(7), evidence showing the absence of an entry normally made in the regular course of business is not hearsay. As the committee notes to the virtually identical federal rule point out, such evidence is arguably not hearsay since it could be viewed as nonassertive conduct. Reporter's Notes, V.R.E. 803(7). The same argument could be made for evidence allowed in under Rule 803(10).

not necessarily negate her wilful intent to lie. The State's argument did not constitute a "concession" of surprise; it was for the jury, not counsel, to determine whether defendant was surprised. Notwithstanding the State's argument, the court instructed the jury that it should find defendant not guilty if it found that she gave incorrect testimony because of surprise. We need not determine whether this was a correct interpretation of the law since the jury convicted defendant, and there was ample evidence from which the jury could have determined that defendant was not surprised by the questioning at the inquest. See *Lowe v. Beaty*, 145 Vt. 215, 218, 485 A.2d 1255, 1258 (1984) (sufficient evidence to support plausible theory underlying jury's verdict).

Defendant also alleges several instances of prosecutorial misconduct. Most of these allegations concern defendant's disagreement over the State's handling of the inquest and its presentation or characterization of certain testimony and evidence. Upon review of the record, we conclude that each one of these allegations is completely unfounded; none of them merit further discussion.

## VI.

Defendant next claims that the court erred by not charging the two-witness rule. We disagree. The two-witness rule requires that perjury be proved by the testimony of two witnesses, or by the testimony of one witness with independent corroborating evidence. *State v. Woolley*, 109 Vt. 53, 57, 192 A. 1, 3 (1937). Strict adherence to the two-witness rule was abandoned by this Court in *Woolley*, which pointed out that an increasing number of jurisdictions had sustained perjury convictions based on circumstantial evidence, as long as the evidence proved defendant's guilt beyond a reasonable doubt. *Id.* at 62, 192 A. at 4; see also *United States v. Lighte*, 782 F.2d 367, 373 (2d Cir. 1986) (circumstantial evidence, including proof of a motive to falsify, may serve to convince jury beyond reasonable doubt of the declarant's criminal intent in perjury prosecution). Many courts have held that the testimony of a handwriting expert is sufficient evidence to sustain a perjury conviction. See, e.g., *Stassi v. United States*, 401 F.2d 259, 262–63 (5th Cir. 1968) (two-witness rule inapplicable where government's expert wit-

ness testified that the defendant's signature and photograph were on the passport the defendant had denied obtaining), *vacated on other grounds*, 394 U.S. 310 (1969); *United States v. Collins*, 272 F.2d 650, 652 (2d Cir. 1959) (testimony of government's expert witnesses on when type style used in document became available was sufficient to convict the defendant of perjury for falsely stating that he had signed document in a certain year; test is not whether evidence is "direct" but whether it is "of a quality to assure that a guilty verdict is solidly founded"), *cert. denied*, 362 U.S. 911 (1960); *Brown v. State*, 225 Md. 610, 617, 171 A.2d 456, 459 (1961) (handwriting expert's testimony that the defendant had signed a confessed judgment note was sufficient to sustain perjury conviction); *People v. Wright*, 214 N.Y.S.2d 461, 462 (Schenectady County Ct. 1961) (two-witness rule inappropriate in perjury case involving handwriting experts since "oath against oath" rationale that spawned rule does not exist in such a case). We will not require two witnesses where a perjury charge is supported by the testimony of a handwriting expert. The trial court's refusal to charge the jury on the two-witness rule in the present case was not erroneous.

## VII.

Next, defendant contends that the evidence does not support the verdict. The first count charged defendant with falsely swearing that she never added her name on file jackets to alter the record of her court appearances. The relevant testimony provided by Judge Wheel at the inquest was as follows:

Q: Judge Wheel, did there ever come a time when you went through files, a number of files, in Chittenden Superior Court and made some changes on the jacket entries yourself?

A: Never.

Q: Was there ever a day or a weekend in 1985 or 1986 when you went to Chittenden Superior Court to correct some entries on jacket files?

A: Never, never wrote on a jacket.

Q: You never wrote on a jacket?

A: Not to correct anything at any time. Reviewed them on the advice of my attorney. I reviewed to get the con-

sensus that I spoke about earlier, but to change, to delete, to add, never.

Q: So any time that you would have written on a jacket entry, it would have been at the time that it was appropriate to put an entry on requested of you by a clerk?

A: It would not have been an entry. It may have just been the judge's initials.

Q: So if your initials are on any jacket files, it's because at the time that the hearing was concluded, for example, or the action was taken—

A: That's very rare; very, very rare.

Q: But the only time you would have done it was at the time it was appropriate to do so?

A: Right there in front of the judge; right there in front of the deputy clerk.

Q: And not some period of time after?

A: Never; never.

Defendant contends that the questions are misleading and ambiguous, and that her responses are not false because (1) she consistently acknowledged during the inquest that she had written on file jackets; (2) there was no evidence that she had changed a file jacket entry, as opposed to writing her initials or signature; and (3) there is no evidence that she wrote on any file jackets during the period she reviewed the files. These arguments are without merit.

Neither the prosecutor's questions nor the defendant's responses were ambiguous or misleading. Defendant's assertion that she understood the questions to refer solely to January 25, 1986, when she entered the courthouse on a Saturday to review the files, was presented to and rejected by the jury. See *United States v. Corr*, 543 F.2d 1042, 1049 (2d Cir. 1976) (in prosecution for making false statement to government agency, the defendant's interpretation of the government's questions was issue for jury). Further, there is no inconsistency in defendant's statement that on rare occasions she may have written her initials on file jackets at the request of a clerk or in the presence of another judge, and her statement that she had never written on the files to correct, change, or add to the record. There was

ample evidence, including expert testimony, that defendant added her signature to certain file jackets; given the facts in this case, adding her signature was equivalent to changing the file jacket entries.

The second count charged defendant with falsely swearing that she did not add her signature to a particular file jacket. The relevant inquest testimony given by Judge Wheel was the following:

Q: Let's turn to Page 2. Unfortunately it's a worse copy of State's 6, and in the middle of it dated "10/1/85." Does this also look like another jacket file?

A: Yes.

Q: It says, "10/1/85," and it begins, this writing says, "Cause reset for hearing," etc.?

A: Um-hum.

Q: And below that is a—it's hard to see, but it's a signature that says, "Judge Wheel"; does it not?

A: It says that.

Q: Is that your signature?

A: I don't know.

Q: Do you recall ever having written your name on that document?

A: I don't have any recall at all.

Q: The way you explained it before the only time you would have written on jacket files, on jacket entries, would have been at the request of the clerk in front of a judge, and you would have put your initials down?

A: It would have been initials.

Q: So not your full name?

A: Never; no.

Q: So then as we're looking on Page 2 of State's 6, you would not have written your signature in the middle there under the "10/1/85"?

A: Never there; only initials.

Q: So you could not have written your signature here as well?

A: I don't believe I have ever. I have no recall of doing such a thing.

Defendant argues that this count must fail as a matter of law because it is merely a statement that she would have written her initials where the signature appeared. We disagree. Despite the prosecutor's comments regarding the legibility of the State's exhibit, upon examination of the file jacket we note that defendant's signature is readily discernible. At the inquest, defendant never indicated that she could not make out the signature; rather, while examining the particular file jacket, she acknowledged that the signature on it said "Judge Wheel," and then stated that she could not recall writing the signature and that she would "never" write her full signature on such a file jacket. Later, at trial, she again examined a copy of the same signature and admitted that it was her signature. The jury had sufficient evidence to conclude that defendant's testimony at the inquest amounted to a false denial that she had signed the file jacket in question. Cf. *State v. Woolley*, 109 Vt. at 63, 192 A. at 5–6 (perjury conviction upheld based on State's circumstantial evidence that the defendant was lying when she said she did not "remember" having seen something happen).

The third count charges defendant with falsely swearing that she did not sign another specific file. The relevant testimony given by Judge Wheel was the following:

Q: Okay. On Page 3 of State's 6 again, does this look like—

A: That's a jacket; yes.

Q: And at the bottom there's an entry of "12/20/85," and it has some writing there?

A: Yes.

Q: And then on the bottom left-hand corner, there are two signatures; one says, "Judge O'Dea," and one says, "Judge Wheel." Is that your signature as "Judge Wheel"?

A: No. I don't write like that.

Defendant argues that there was no evidence that she recognized the signature. We cannot agree. The State's evidence concerning the distinctiveness of defendant's signature, her awareness of wrongdoing in altering court files, and her motive to cover up her alteration of court files was sufficient for the jury to conclude that she did recognize her signature, but denied that it was hers. See *Commonwealth v. Karafin*, 224 Pa.

Super. 449, 457, 307 A.2d 327, 332 (1973) (jury may infer defendant's belief in falsity of allegedly perjurious statements from proven circumstantial evidence).

■ Defendant further argues that the State presented no evidence that she wrote her name on the files after she learned of the State's investigation; therefore, the motive element was missing. We reject this argument. Upon review of the record, we conclude that there was substantial evidence that defendant had an opportunity to alter each of the files after the date on which she most likely learned of the investigation. We also conclude that, except for one particular hearing at which defendant's presence was never disputed, the State presented sufficient evidence of defendant's absence from each of the proceedings for which the file jackets were altered to show her presence. In short, there was sufficient evidence for a reasonable jury to conclude that defendant knowingly gave false statements at the inquest in order to deny that she attempted to conceal her attendance record at court proceedings.

Finally, defendant argues that the cumulative effect of errors in this case mandates reversal. Since we have found no error, no cumulative effect exists. See *State v. Billado*, 141 Vt. 175, 184, 446 A.2d 778, 783 (1982).

*Affirmed.*