### State of Vermont v. Kirk Wool

[648 A.2d 655]

No. 93-023

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed July 8, 1994

*Scot Kline*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Dori Jones*, Burlington, for Defendant-Appellant.

**Allen, C.J.** Defendant Kirk Wool appeals his conviction on two counts of aggravated sexual assault, 13 V.S.A. §§ 3252(a)(1), 3253(a)(3), following a jury trial. We affirm.

At trial, the victim testified as follows. A few minutes past midnight on January 18, 1992, she was walking the short distance home from a friend's house in downtown Burlington. Defendant stopped his car and offered her a ride. The victim did not know defendant, but she accepted the ride because it was snowing and she was carrying a table that a friend had lent her to furnish her new apartment. Defendant drove toward the victim's house, but when they approached her residence he did not stop. Instead, he grabbed the victim in a head-lock and drove to his house several blocks away. Rather than risk harm by resisting defendant, the victim submitted to his control. When they arrived at his house, defendant held the victim's arms behind her back and ushered her inside.

The victim testified that defendant brought her upstairs to his bedroom, locked the door behind them, and ordered her to remove her clothes. He prepared to inject himself with cocaine, and said that he was going to play with her until he had finished the cocaine and would hurt her if she refused to comply. Defendant bound her hands and feet with a leather belt and a dirty towel. Over the next few hours, defendant performed anal intercourse and oral sex on the victim, and forced her to perform oral sex on him. He forced her to lick his feet and anus. The victim also reported being struck on the back, possibly by a stick that defendant had in the room. According to her story, defendant repeatedly injected himself with cocaine during the night. She attempted to reason with him and calm him down by getting him to talk about himself and his family, and talking about herself. Toward morning, defendant "came down" from the drugs and let her leave. He offered to drive her home or get her a taxi, but she declined. She retrieved the table and rug, and returned to her friend's apartment where she had eaten dinner the night before.

Defendant told a very different story. He admitted meeting the victim that night and offering her a ride home. They chatted for the fairly-brief drive to her apartment. He asked her to come to his house to watch a movie, and she agreed. On arriving at defendant's house, they sat together in the living room, and then went upstairs to meet his roommates. He discovered that they were not home, contrary to their usual practice and his expectations. They proceeded to his room, where they chatted about themselves and their families. He turned the conversation to sex, and they engaged in consensual foreplay. He denies any intercourse took place, but admits that the victim indicated she wanted him to penetrate her anus with his penis, and that he did so briefly until she indicated discomfort. According to defendant, they spent the rest of the night together engaged in conversation, foreplay-type activity, and mutual masturbation. He maintains that their interaction was completely consensual.

A couple of hours after returning to her friend's apartment, the victim went to the hospital and was given a thorough medical examination by Dr. Misty Porter. The victim explained that she had been bound and raped. According to her trial testimony, Dr. Porter's examination revealed tears in the superficial tissues of the victim's rectum, but uncovered no other cuts or bruises on her body. The doctor performed the standard protocol for gathering evidence of sexual assault in the course of the examination.

Defendant was arrested and charged with two counts of aggravated sexual assault, 13 V.S.A. §§ 3252(a)(1), 3253(a)(3). A public defender was appointed to represent defendant before his arraignment on January 20, 1992. On June 9, 1992, defendant filed a motion requesting to proceed pro se, and the motion was granted after a lengthy colloquy between defendant and the court. The court ordered the public defender, Jerry Schwarz, to act as standby counsel to defendant, which meant that Schwarz should be present in the ensuing proceedings as much as possible, and that he provide defendant the materials and services to take depositions.

On appeal, defendant claims the following errors: (1) denial of investigative services and expert testimony, (2) failure to appoint counsel for defendant at the start of the third day of trial, (3) jury prejudice, and (4) prejudicial remarks by the prosecution during jury voir dire.

## I.

## A.

On July 8, 1992, defendant filed a motion requesting in part that the court approve an investigator to research an expert witness to respond to Dr. Porter's examination report of the victim. The motion was denied. Defendant maintains that denial of the services of an investigator and expert witness, at public expense, contravened his constitutional rights to present evidence and call for witnesses in his defense, and his rights under the Public Defender Act (PDA), 13 V.S.A. §§ 5201–5277. Defendant makes the constitutional claims for the first time on appeal; therefore, we do not consider them. *State v. Prue*, 138 Vt. 331, 331–32, 415 A.2d 234, 234 (1980).

Defendant bases his claim of entitlement to investigative and expert witness services at public expense on § 5231 of the PDA. The State contends that defendant failed to raise the statutory claim as well as the constitutional claim. Specifically, the prosecution argues that defendant did not direct the court's attention to the PDA in arguing that he had the right to investigative and expert witness services, even though he did not accept a public defender. In considering this claim of nonpreservation, we acknowledge that defendant exercised his constitutional right to represent himself at trial, and was aware that "he [might] conduct his own defense ultimately to his own detriment." *Faretta v. California*, 422 U.S. 806, 834–35 (1975); accord *State v. Dragon*, 135 Vt. 168, 169, 376 A.2d 12, 13 (1977); cf. *Olde & Co. v. Boudreau*, 150 Vt. 321, 322, 552 A.2d 793, 794 (1988) (court responsible to insure only that pro se litigant not be unconscionably disadvantaged).

■ Aside from exceptional instances of plain error, a party must make a timely objection to preserve an issue for review. *State v. Ayers*, 148 Vt. 421, 425, 535 A.2d 330, 333 (1987). This rule ensures that the trial court first addresses correctable error, and facilitates the development of a record for appeal. *State v. Kasper*, 137 Vt. 184, 190, 404 A.2d 85, 89 (1979). The preservation rule promotes fair trials and minimizes mistrials and retrials, because it guarantees that attorneys will not reserve trial court errors for first airing on appeal in the event of an unfavorable outcome. *Id.* at 190–91, 404 A.2d at 89.

In his motion, defendant reiterated that he was found indigent, that there had been no change in his financial status, and that he had waived appointed counsel. Defendant went on to request "that the Court *appoint* an *investigator* for the purpose of researching an

'expert witness'—defense would call to testify in his defense of Complainant's story as related to (State's medical exam and report of) State's Witness Misty Porter M.D." In a hearing on the motion held July 17, 1992, the following exchange occurred:

> THE COURT: Well, the . . . problem is you've asked for a number of things to take place pretrial, and it's still going to be impossible for you to accomplish it, and Mr. Schwarz [defendant's former counsel, acting as "standby counsel"] might be able to accomplish some of those things.
>
> THE DEFENDANT: I'm not sure what you would be referring to, Judge.
>
> THE COURT: Well, investigator, for instance.
>
> THE DEFENDANT: Okay.
>
> THE COURT: I mean, we don't pay for an investigator. So that would not be something that's doable.
>
> . . . .
>
> THE DEFENDANT: I think what I detailed was for a specific reason. It wasn't that I wanted an investigator to run around town. It was for a specific reason, and that was to research a professional witness with regards to responding to the medical report.
>
> THE COURT: That would be more possible with Mr. Schwarz, than if he wasn't in, because if he's not in, then there is just no resources available.
>
> . . . .
>
> THE COURT: I think that we understand. So those are—that's what you're missing if you go on your own, or you can have some limited services from Mr. Schwarz [as standby counsel], or you can have all of the services.

Defendant never cited the PDA in support of his contention that he was entitled to defense-related services at public expense. He argued, however, that he would have been afforded these services had he accepted the public defender, and should not be penalized by his decision to exercise his right to represent himself. Defendant raised the issues embodied in the language and contents of the statute—the right to a public defender and associated services of a constitutionally adequate defense. Cf. *Rowe v. Brown*, 157 Vt. 373, 378, 599 A.2d 333, 336 (1991) (statutory remedy need not be cited at trial if party "clearly and adequately describe[s] the relief sought at trial"). Moreover, the court's ruling illustrates that the court squarely

addressed the issue and reasoned that an indigent's right to a defense paid from the public fisc is an "all or nothing" proposition. Defendant raised the issue of assistance, and the court considered and ruled on it, leaving an ample record for appellate review. Therefore, the issue has been preserved and may be examined on appeal.

## B.

Section 5231 of the Vermont Public Defender Act provides:

> A needy person who is being detained by a law enforcement officer without charge or judicial process, or who is charged with having committed or is being detained under a conviction of a serious crime, is entitled:
>
> (1) To be represented by an attorney to the same extent as a person having his own counsel; and
>
> (2) To be provided with the necessary services and facilities of representation as authorized or later approved by the court. The attorney, services and facilities, and court costs shall be provided at public expense to the extent that the person, at the time the court determines need, is unable to provide for their payment without undue hardship.

13 V.S.A. § 5231. Our goal is to effect the intent of the legislature, which we attempt to discern first by looking to the language of the statute. *Spears v. Town of Enosburg*, 153 Vt. 259, 261, 571 A.2d 604, 605 (1989). Section 5231 describes the defense services available to an indigent in two discrete subsections, an indication that the right to an attorney stands separate and distinct from the right to the services and facilities of representation. Had the legislature intended to link the two rights, § 5231 would not likely have been drafted with separate subsections.

This interpretation dovetails with the criterion for qualification under the Act. "Needy person" is defined as "a person who at the time his need is determined is financially unable, without undue hardship, to provide for *the full payment of an attorney and all other necessary expenses of representation* or who is otherwise unable to employ an attorney." 13 V.S.A. § 5201(3) (emphasis added). Thus, an individual may qualify as "needy" despite the fact that the person can afford to pay for the services of or can otherwise retain an attorney, but cannot afford other necessary representation expenses. It follows that § 5231 must be construed to entitle needy persons who are represented, either by an attorney or themselves, to public funding for

other necessary expenses. Otherwise, the test of need under § 5201(3) would be reduced to a question of whether a person can afford to pay for an attorney, a result contrary to the plain meaning of the statute.

Support for this interpretation of § 5231 comes from commentary to the Model Public Defender Act, which was adopted as Vermont's PDA. See *State v. Caron*, 155 Vt. 492, 511, 586 A.2d 1127, 1138 (1990); see also *State v. Papazoni*, 159 Vt. 578, 581, 622 A.2d 501, 503 (1993) (examination of the intent and purposes behind model act offers valuable guidance in construing statute based on act). The National Conference of Commissioners on Uniform State Laws explained:

> The approach of the new Model Act is not to define the exact limits of the right to an adequate defense, but to provide that, whatever the Supreme Court says it consists of for persons of adequate means, the needy person is entitled to the same protection and that, to the extent he is unable to pay for it, he is entitled to have it paid for by the state.

Handbook of the National Conference of Commissioners on Uniform State Laws 270 (1970). The Model Act focuses on the right to put forward a defense, which generally includes the services of an attorney. It makes sense to view the Act as providing any necessary services of defense that an indigent cannot otherwise obtain. Other jurisdictions have adopted the similar reasoning in construing their public defender statutes. See, e.g., *Thompson v. State*, 525 So. 2d 1011, 1011–12 (Fla. Dist. Ct. App. 1988) (per curiam); *State v. Manning*, 560 A.2d 693, 698–99 (N.J. Super. Ct. App. Div. 1989). This interpretation also fosters sound fiscal and public policy, because a defendant would not be required to forego pro bono counsel or self-representation simply to obtain associated services at the public expense. *Manning*, 560 A.2d at 699.

In summary, we hold that a defendant who qualifies as a needy person under Vermont's Public Defender Act has a distinct right "[t]o be provided with the necessary services and facilities of representation as authorized or later approved by the court." 13 V.S.A. § 5231(2). Exercise of that right cannot be conditioned on acceptance of the services of an attorney appointed under 13 V.S.A. § 5231(1).

Defendant, however, fails to demonstrate reversible error from the ruling regarding investigation and expert witness assistance, because he did not make the requisite showing that the expert

witness was necessary to his defense.[1] See *id.* § 5231(1). This entails showing that an adequate defense cannot be mounted without that expertise. *State v. Pizzuto,* 810 P.2d 680, 713 (Idaho 1991); *State v. Fecteau,* 587 A.2d 591, 599–600 (N.H. 1991); *State v. Gleason,* 785 P.2d 376, 377 (Or. Ct. App. 1990). A defendant requesting expert assistance at state expense must demonstrate specifically the purpose and nature of the expert assistance; bare assertions of need do not suffice to meet this burden. See *Caldwell v. Mississippi,* 472 U.S. 320, 323–24 n.1 (1985) ("undeveloped assertions that the requested assistance would be beneficial" insufficient to establish need); *Hough v. State,* 560 N.E.2d 511, 517 (Ind. 1990) (no abuse of discretion for trial court to deny indigent defendant's request for ballistics expert, where defendant made no showing to suggest error in tests by State's experts, offered no new evidence to render experts' testimony questionable, and failed to show new evidence was available or likely from other experts).

■ Defendant's request for assistance did not rise to the level of a proper showing of necessity, as he did no more than claim that he needed an expert to respond to Dr. Porter's medical examination report. He never detailed that he wished the assistance of expert testimony to challenge Dr. Porter's opinion that the rectal damage was consistent with forced anal sex, or that the expert would respond to Dr. Porter's testimony that the absence of bruising was consistent with the victim's story. Defendant had the opportunity to depose Dr. Porter, and could have based a specific need for an expert on her deposition testimony rather than claim, after cross-examination, an inability to rebut her in-trial testimony effectively. Cf. *Woodard v. State,* 743 P.2d 662, 664 (Okla. Crim. App. 1987) (assessing need for responsive scientific expert testimony, court reasons that "scientific expert is often able to explain to the jury how a conclusion was reached[;] the [defendant] can attack that conclusion, and then the jury can then decide whether there was a sound basis for the conclusion"). Defendant's task of demonstrating need might have been easier had he not been incarcerated or had he been represented by counsel, but he knowingly and intelligently accepted the formidable obstacles associated with self-representation. In failing to make the requisite demonstration of need for an expert witness, defendant

---

[1] We assume, for purposes of analysis only, that reimbursement for the services of an investigator would have been authorized had defendant made the necessary showing regarding the medical expert.

cannot benefit from the court's erroneous ruling that a needy person must accept a public defender to obtain other necessary defense services at state expense.

## II.

At the start of the third day of the four-day trial, defendant told the court that he felt overwhelmed by the task of presenting his defense, and said that he might need an attorney. The trial court reviewed with defendant the fact that he had knowingly and intelligently waived his right to an attorney after being warned of the difficulties of self-representation. The court also noted, and the record bears out, that defendant had performed very well at trial despite his protestations of ineffectiveness. The State was unwilling to brook any delay for a change in defense representation, and the court informed defendant he would have to live with his decision to represent himself. However, defendant was given the opportunity to consult with standby counsel and a mental health counselor, after which he informed the court he was prepared to proceed with the remainder of the trial.

■■ The decision whether to appoint counsel mid-trial for a defendant who had been acting pro se will be disturbed only for an abuse of discretion. *United States v. Solina*, 733 F.2d 1208, 1211 (7th Cir.), *cert. denied*, 469 U.S. 1039 (1984); cf. *State v. O'Connell*, 147 Vt. 60, 63, 510 A.2d 167, 168 (1986) (same standard for appellate review of ruling on motion for substitute counsel). Even had defendant not agreed to continue after consulting with standby counsel and a mental health counselor, the trial court did not abuse its discretion in denying the request for an attorney. Defendant waived his right to an attorney and adamantly asserted his right to represent himself. At this point in the trial, the State had presented all but one of its witnesses, including lengthy testimony by the victim. Furthermore, despite the contention on appeal that standby counsel should have been permitted to "step in and continue with the trial," defendant offered no evidence that standby counsel or any other attorney could take over without considerable delay. The trial court did not abuse its discretion in denying defendant's eleventh-hour request for professional assistance. See *State v. Morse*, 126 Vt. 314, 320, 229 A.2d 232, 237 (1967) (defendant must accept results of self-representation).[2]

---

[2] Defendant contends that 13 V.S.A. § 5233 gives him the right to an attorney despite the earlier waiver, but § 5233(b) says only that waiver of counsel at an earlier *stage*

## III.

After his conviction, defendant was reassigned a public defender at his request. He moved for a new trial, alleging in part that a biased jury had deprived him of a fair trial. According to an affidavit in support of the motion, before the start of proceedings on the final day of trial a friend of defendant's mother overheard part of a conversation in a group that included at least one juror. The juror allegedly said, "I don't come to downtown Burlington anymore because the streets are just not safe," and after noticing the affiant, said, "Oops, I guess I wasn't supposed to say that." Also, a man in the group, who was not identified as a juror, allegedly said, "He had to be under the influence of something," at another point in the conversation. Soon thereafter, the jury reassembled for the resumption of trial, and the court inquired whether anything about the case had come to the jury's attention since leaving the courthouse the day before. None of the jurors raised a hand, which the court took as a negative response.

Defendant found out about the alleged statements only after the jury returned a guilty verdict. In an order denying the new trial motion, the court found the woman juror's statement ambiguous and not directed to the merits or probable outcome of the case. The court concluded that the unidentified man's statement also did not necessarily concern the case. Most important, the court found that none of the jury responded affirmatively when asked at the start of proceedings that morning whether anything about the case had come to their attention. Based on the ambiguity of the statements and the lack of juror response, the court rejected defendant's claim of juror misconduct.

■ Since it was never determined whether the unidentified man was part of the jury, we examine defendant's claim both as a question of improper communication between jurors and third parties, and as a question of extraneous influences on the jury's consideration of the case. In either scenario, we review the trial court's denial of the motion for a new trial based on alleged jury prejudice only for an abuse of discretion. See *State v. Wheel*, 155 Vt. 587, 602, 587 A.2d 933, 942 (1990) (expression of opinion by juror); *State v. Dragon*, 135 Vt. at 170, 376 A.2d at 13 (alleged external influence). In this case, defendant bears the burden of demonstrating that the court exceeded its

of a criminal proceeding, such as trial, does not act as waiver at a later stage, such as an appeal or petition for post-conviction relief.

discretion by ruling that he failed to demonstrate jury bias. *Dragon,* 135 Vt. at 170, 376 A.2d at 13.

Turning first to the statement of the woman juror, we are guided by similar circumstances in *State v. Wheel,* in which a juror expressed to a court officer frustration with the lengthy trial process and sequestration, and resentment over what she considered time wasted in the courtroom. This Court held that the trial court had not abused its discretion in concluding that the jury was not unfairly biased, because the statement was "ambiguous and [did] not include a comment on the merits or on the probable outcome of the case." *Wheel,* 155 Vt. at 602, 587 A.2d at 942. In this case, the trial court made a similar finding of ambiguity in the juror's statement. The trial court reasonably concluded that defendant had not demonstrated juror bias, and therefore did not abuse its discretion. *Dragon,* 135 Vt. at 170, 376 A.2d at 13.

We reach the same conclusion regarding the statement of the unidentified man outside the courthouse, which we treat as an alleged outside influence upon the jury. A defendant is entitled to a fair trial free of the suspicious taint of extraneous influences. *State v. Griffin,* 152 Vt. 41, 45, 563 A.2d 642, 645 (1989). Defendant, alleging such irregularity in his trial, must demonstrate that the statement had the capacity to influence the jury, *id.,* and the proof must be more than mere speculation. *Dragon,* 135 Vt. at 170, 376 A.2d at 13–14. We acknowledge that the statement, "He had to be on something," presents a closer question than the juror's statement discussed above, in light of the fact that defendant's drug use during the assault was a significant aspect of the victim's account. On its face, however, the statement did not unambiguously refer to defendant or the trial.

At the start and end of the first three days of trial, the court explicitly warned the jury against discussion of the case among themselves and exposure to outside influences. On the fourth day, the day of the alleged comments, there was no individual examination of the jurors because the court was not informed of the alleged statement before proceeding with the final day of trial. Nevertheless, the court asked if anything about the case had come to the jury's attention since the day before, and the jury's response indicated no cause for concern. Considering the ambiguous statement and the lack of response to the court's general inquiry about extraneous influences, the court acted within its discretion in denying defendant's motion for a new trial based on alleged jury bias. Cf. *State v. Onorato,*

142 Vt. 99, 106–07, 453 A.2d 393, 396–97 (1982) (issue of bias sufficiently resolved when court, after learning that juror had discovered that proceedings were defendant's second trial, determined through general inquiry that jury not prejudiced).

## IV.

Finally, defendant contends that one of the prosecution's comments to the panel during jury selection unfairly appealed to the passion and prejudice of the jury, depriving him of a fair trial. Early in the voir dire by the State, the prosecution said the following:

> Now, do any of you have any idea what a rapist should look like? Do you all agree with me that they can be very different and look very different or look the same?
>
> . . . .
>
> Have any of you ever seen movies or read books, any of you, on Ted Bundy?
>
> . . . .
>
> It's fair to say that Mr. Bundy, who was charged and convicted of raping several women, looked very clean-cut . . . intelligent, a year of law school?
>
> . . . .
>
> So we all know that they can both be good or bad looking, educated or not, and they can sometimes look no different than anyone else. Do you all agree with that?

When it came time for defendant's voir dire, he said the following:

> And [the prosecuting attorney], in her first presentation to you folks, has referred to a Mr. Bundy. I mean, the real concern that I have is that she's made that reference, and she's made that reference with regards to crimes that he was convicted of, and which later apparently he admitted to. I'm not sure—and I guess there's some real concern on my part—how much weight you folks here may have given to that statement.

Defendant then asked if any of the jurors would be swayed by the reference, or have any emotional reaction that might prevent them from considering the case impartially, based on the evidence adduced at trial. The one member who had seen a movie about Bundy was excused from the panel; the rest of the panel said the Bundy

reference would have no impact on their consideration of the case. After his conviction, defendant moved unsuccessfully for a new trial, alleging that the prosecution's reference to Bundy so tainted the jury that it deprived him of his right to a fair trial.

In ruling that the prosecution's statements did not unfairly prejudice defendant, the trial court acted within its discretion. *State v. Richards*, 144 Vt. 16, 22, 470 A.2d 1187, 1191 (1983); see V.R.Cr.P. 33 ("The court . . . may grant a new trial . . . if required in the interests of justice."). The record shows that the State did not make a direct comparison between defendant and Ted Bundy; Bundy was offered as an example to discover whether any potential jurors had preconceived notions of how a rapist should look. Defendant himself inquired regarding any potentially prejudicial effect of the statement, and secured disqualification of one person as a result. Considering the minimal chance that defendant was prejudiced by a relatively brief series of questions and statements during jury draw, the trial court did not abuse its discretion in denying defendant's motion.

*Affirmed.*